RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

APR 2 6 2023

KEVIN P WEIMER, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| KIMBERLY ARNOLD<br>Plaintiff, ) ) ) ) | CASE NO. |
| vs. ) ) | |
| FC HUNTERS GLEN d/b/a )<br>WATERS EDGE APARTMENTS; ) ) | **1:23-CV- 1913** |
| WELLER MANAGEMENT; ) ) | |
| ADAM JOFFE; ) ) | |
| DAVID GATES; )<br>in his official capacity as )<br>Executive Vice President of )<br>Weller Management ) | **COMPLAINT FOR DAMAGES** |
| ) | **JURY TRIAL DEMANDED** |
| NANCY CROLLEY; )<br>in her official capacity as )<br>Regional Property Manager of )<br>Weller Management ) | |
| ) | |
| MARILYN PUMPHREY; )<br>in her official capacity as )<br>Property Manager of )<br>Water's Edge Apartments ) | |
| ) | |
| GOODMAN MCGUFFEY LLP; ) | |
| ) | |
| STEPHANIE GLICKAUF; and ) | |
| ) | |
| PEACHTREE MITIGATION ) | |

Defendants.        )
_____)

## **PRELIMINARY STATEMENT**

1. Plaintiff Kimberly Arnold moved into Water's Edge Apartments at 8601
   Roberts Dr. Sandy Springs, GA 30350 on November 25, 2022, after
   management requested her to move in early on two separate occasions. Not
   only did they request that she move in early to help them out with their
   paperwork, she was deceived into believing that the unit was accessible and
   had no steps. Plaintiff is disabled and uses a walker and wheelchair to get
   around which was made clear to management when she submitted her
   disability income to management. On move in day, when Plaintiff arrived
   they placed Plaintiff in a unit that was only accessible with steps leading to
   the apartment. Plaintiff had to have help going up the steps from several
   people including the assistant property manager.

2. Once Plaintiff entered the apartment, the maintenance crew was in the unit
   painting, fixing the hvac unit and fixing a water leak which they lied and
   said came from the toilet, so they knew the mold was present in the unit.
   Before they left, they stated they would come back to fix the blinds in the
   second bedroom and they never came back. The apartment was definitely
   not the unit listed on the website. When Plaintiff entered the apartment, I

2

began noticing the horrible paint job throughout the entire unit as if it had

been rushed just to get the apartment occupied. On November 27, 2022,

Plaintiff noticed water on the floor in the hallway that she thought came

from it raining that day, however upon further investigation, it was revealed

that the water was coming from a hot water heater that had not been

maintained properly, further investigation would lead to Plaintiff finding

active black mold in that same area where the hot water heater and hvac unit

is located and growing up the wall and door panel. *See attached as Exhibit

A.*

3.  Further investigation would find that the mold had penetrated the sheetrock

inside the wall and the other side of the walls nearest to the utility room

which includes the second bedroom and it's closet, the second bathroom and

it's closet. Upon lifting the carpet and tile in those areas, mold was also

found under the carpet. Due to the mold originating where the hvac unit is,

Plaintiff was not able to run the heat during some of the coldest days of

December because there is a possibility that the mold has penetrated the unit

as well, per a conversation with a professional mold company that came out

and inspected the unit. *See attached as Exhibit B.* On November 27, 2022,

Plaintiff sent pictures to management of her findings. They replaced the hot

water heater, but did not treat the mold until almost a month later after several requests and follow ups had been made.

4. The actions of the maintenance crew and management have all been nothing but deceptive. They knew the hot water heater was leaking, but they blamed it on a toilet. They knew it was mold in the apartment, yet still decided to lease it to make more money instead of putting tenants health and well being first, which is unjust enrichment. Plaintiff has suffered from severe headaches and anemia from the mold in the unit. Plaintiff has had to go to the hospital due to headaches, fever, nausea, vomiting and anemia all of which can be triggered by black mold.

5. Plaintiff has reached out to two different professional mold companies and they both said the same thing. *See attached as Exhibit B.* The walls needed to be cut out and replaced, however management prevented them from doing so by stating that they needed to contact corporate before any repairs could be made. Management and regional property management has known about these mold issues for a very long time and could care less about tenants health, which is why they continue to lease these inhabitable units which is inhumane and cruel. The only reason why Defendant FC Hunters Glen, Defendant Weller Management, Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn Pumphrey decided to hire their own mold

professionals was not because they care about Plaintiff's health and well being but to try and counter and debunk Plaintiff's claims, as it took them a month and a half to address the problem. There was a similar mold complaint submitted to the City of Sandy Springs code enforcement against Defendant FC Hunter's Glen Apartments on January 17, 2019 and was closed on February 19, 2019, which in unacceptable. *See attached as Exhibit C.* They allowed this tenant to be affected by this mold for an entire month, the same as Plaintiff. Another tenant at Renew at Sandy Springs notified the news media about mold problems and revealed that management didn't do anything until they began reaching out to professionals on their own. *See attached as Exhibit D.* The fact that they have allowed this to go on for this long without making regular inspections to problem apartment complexes is completely unacceptable. The fact that Plaintiff requested an accessible unit and was deceived into believing she had an accessible unit and further denied, places all Defendants in violation of the Fair Housing Act and the Americans with Disabilities Act and other applicable laws. Further, the fact that management leased out an inhabitable unit of which they did know or should have had reasonable knowledge of the black mold in the unit places them in "Breach of Implied Habitability" and other Georgia tenant-landlord law and all other applicable laws, and therefore they are liable for damages.

5

New property management has apologized to Plaintiff on several occasions for their actions, but could do very little to fix it. *See attached as Exhibit E and F.* There have been several complaints made about mold by past and current residents as well as horrible reviews left about Defendant FC Hunters Glen. *See attached as Exhibit G.* Defendants have a duty and obligation to keep dwelling units in habitable condition and make appropriate repairs in a "reasonable time frame", pursuant to O.C.G.A. § 44-7-13 and other applicable laws.

6. Further, Defendants have a duty and obligation to comply with the American with Disabilities Act and Fair Housing Act, pursuant to O.C.G.A. § 8-3-200; and 42 U.S.C. § 3604 and all other applicable laws. Plaintiff did not attempt to make handicap accessible changes to the unit due to the fear that Defendant FC Hunter's Glen, Defendant Weller Management, Defendant David Gates, Defendant Nancy Crolley, Defendant Marilyn Pumphrey, Defendant Adam Joffe, Defendant Goodman McGuffey and Defendant Stephanie Glickauf would have stopped the modifications as they did with the mold, and could possibly say that Plaintiff damaged the property resulting in possible criminal or civil action against Plaintiff. *See attached as Exhibit H.* Plaintiff moved to the area because it was a nicer and safer area only to find out that the property has not been maintained properly and

infested with black mold.  Plaintiff trusted their expertise, skill and

knowledge to know which apartments are habitable and which ones are not,

which ones are ready for leasing and which ones are not, which ones pose a

serious threat to health and safety and which ones do not, but she also relied

on the advertising through pictures and statements on the website which

were deceptive. *See attached as Exhibit I and J.* Plaintiff has tried mitigating

with Defendants without involving the Court to no avail. *See attached as*

*Exhibit K.* Defendant Weller Management retained an attorney, who stated

in their letter to Plaintiff that all the mold has been removed and it posed no

more threat to Plaintiff's health, when in fact after the Defendants rectified

the initial mold issue in the utility closet, Plaintiff found more mold in her

room where the water from the hot water heater leaked into on January 21,

2023. *See attached as Exhibit L and M,* according to the Centers for Disease

Control and Prevention, dead mold can still cause allergic reactions. Please

see Exhibit .It was located in the doorway, under the carpet in her room, and

on each side of the doorway leading into the closet. *See attached as Exhibit*

*M.* Plaintiff's claims are supported with substantial evidence and the first

mold professional that Plaintiff contacted stated that there was mold visible

throughout the unit, *See attached as Exhibit B.* Defendants contacted their

own mold company that stated that it wasn't mold, only to contradict

Plaintiffs claims to keep from being liable and negligent, when in fact they should have contacted a professional mold company right after Plaintiff sent pictures on November 27, 2023. Defendant Weller Management, Defendant FC Hunter's Glen, Defendant David Gates and Defendant Nancy Crolley then had painters come to paint over the mold without treating it or drying it. *See Exhibit U.* The evidence is substantial and overwhelming and in his report he lied and stated that the mold was not mold only because there was no moisture present to keep it growing, when in fact it was mold and for it to be growing up the walls on each side of the bedroom doorway, there had to have been moisture there at one time and the Center for Disease Control and Prevention's report states that dead mold can still have negative impact on a persons health due to allergic reactions. Further, Defendants Weller Management, David Gates, FC Hunters Glen and Nancy Crolley knew that the door frame had to be removed due to the mold having penetrated the inside of the wall, but they refused to make the repairs. Instead, they had Peachtree Mitigation lie and say that it wasn't mold just to keep from having to make the necessary repairs, which is why Peachtree Mitigation asked the property if I was going to be recording him. Peachtree Mitigation also stated in the report that there was no sign of an active leak, moisture count was dry and the humidity count was normal, when in fact more active mold was

8

found after that fraudulent report was submitted. *See Exhibit Z.* Peachtree

Mitigation should have had knowledge of the affects of dead black mold

affecting one's health. Instead they made a report stating that it no longer

posed a threat. On or about January 23, 2023, the new property manager

came in and inspected the entire apartment and found more mold under the

sink in the second bathroom. *See attached as Exhibit N and R.* On February

4, 2023, more mold was found under the kitchen sink. *See attached as*

*Exhibit X.* On February 13, 2023, Plaintiff found more mold in kitchen

cabinet. *See attached as Exhibit Y.*


## PARTIES


7. **PLAINTIFF KIMBERLY ARNOLD** is a citizen of the State of Georgia.

   She is a resident of Sandy Springs, GA, Fulton County, GA. She resides at

   8601 Roberts Dr. Apt. 8-11, Sandy Springs, GA 30350. She is a citizen of

   the State of Georgia.


8. **FC HUNTERS GLEN d/b/a WATERS EDGE APARTMENTS** is a

   citizen of the State of Georgia and can be served at 8601 Roberts Drive,

   Sandy Springs, GA 30350.

9.  **DEFENDANT WELLER MANAGEMENT** is a citizen of the State of
    Florida located at 150 2nd Avenue N. Suite 710, St. Petersburg, FL 33701
    doing business as Waters Edge Apartments at 8601 Roberts Dr. Sandy
    Springs, GA 30350

10. **ADAM JOFFE** is a citizen of the State of Georgia and can be served at
    3340 Peachtree Rd, NE Suite 2100 Atlanta, GA 30326.

11. **DEFENDANT DAVID GATES** is a citizen of the State of Florida; the
    Executive Vice President of Weller Management doing business at 8601
    Roberts Dr. Sandy Springs, GA 30350.

12. **DEFENDANT NANCY CROLLEY** is a citizen of the State of Georgia;
    the Regional Property Manager for Weller Management and oversees
    operations at Waters Edge Apartments doing business at 8601 Roberts Dr.
    Sandy Springs, GA 30350.

13. **DEFENDANT MARILYN PUMPHREY** is a citizen of the State of
    Georgia. She resides at 8601 Roberts Dr. Sandy Springs, GA she conducts

transactions at 8601 Roberts Dr Sandy Springs, GA 30350 as property

manager for Waters Edge Apartments.

14. **DEFENDANT GOODMAN MCGUFFEY LLP** is a citizen of the State of

Georgia doing business at and can be served at 3340 Peachtree Rd NE, Suite

2100, Atlanta, GA 30326.

15. **DEFENDANT STEPHANIE GLICKAUF** is a citizen of the state of

Georgia and can be served at 3340 Peachtree Rd NE, Suite 2100, Atlanta,

GA 30326.


## JURISDICTION AND VENUE

16. This action is brought to enforce rights conferred by the United States

Constitution and Georgia Constitution and other applicable laws. The

amount in controversy exceeds $75,000. It is brought under the authority

vested in this Court pursuant to O.C.G.A § 44-7-13; 42 U.S.C. § 3604; 42

U.S.C. § 12101 and other applicable laws.


17. Venue is proper under 28 U.S.C. § 1391(b)(1)(b)(2) because this is a

judicial district in which a substantial part of the events or omissions giving

rise to the claim occurred.

## FACTS ENTITLING PLAINTIFF TO RELIEF

**A. Defendants have a duty and obligation to provide habitable dwelling units to tenants pursuant to the "Implied Warranty of Habitability"**

18. O.C.G.A. § 44-7-13 prevents landlords from leasing uninhabitable living units to tenants. When uninhabitable living units are leased with reasonable knowledge of the shape that they are in, landlords are then in violation of Georgia's Implied Warranty of Habitability's laws and other applicable tenant-landlord laws.

**B. Defendants are failing to provide habitable dwelling units to tenants**

19. Defendants have intentionally chosen to continue to lease dwelling units knowing the uninhabitable conditions of the units before hand. They have chosen to do this for financial gain, while tenants' health and safety are being put at risk due to active black mold and rusty hvac units. Defendant City of Sandy Springs and Defendant Yvonne Shaw all have a fiduciary and legal duty and obligation to ensure that all dwelling units are free of mold, asbestos, rodents and pests. They are to take complaints of mold seriously by giving cease and desist orders and or injunctions to repeat violators which

12

would prevent tenants health, safety and well being from being at risk due to mold exposure.

**C. Defendants have a duty to provide accessible units to people with disabilities upon request.**

20. 42 U.S.C. 3604; 42 U.S.C. § 12101 and the 14th Amendment to the United States Constitution and other applicable laws were enacted to protect the rights of people with disabilities and handicaps when leasing or buying dwelling units. The laws protects people with disabilities from discrimination as well as ensuring that those suffering from disabilities have the opportunity to make request for reasonable accommodations as well as have the same opportunities for persons without disabilities.

**D. Defendants are refusing to make and has blocked Plaintiff from making reasonable accommodations to the unit due to her disability**

21. Plaintiff put in request to have a unit that was accessible without steps. Management then lied and told Plaintiff that none of their units were accessible without steps, when in fact, there are units accessible without steps. Then, on move in day management told Plaintiff that her unit was accessible when it was not. They placed Plaintiff in the back of the apartments, with steps where she could not access any of the amenities.

13

Further, when the black mold was found, and Plaintiff began seeking out
mold professionals, only then did an accessible unit. However, Plaintiff had
withheld rent for repair and deduct purposes and was told by Defendant
Adam Joffe that she was not authorized to make any changes to the property,
which is a direct violation of the Fair Housing Act and the Americans with
Disabilities Act. Plaintiff was willing to make all necessary repairs to the
unit so that it would not inconvenience her to have to move, she was blocked
from making repairs by Defendant Weller Management and their attorney.
Every attorney not only takes an oath to represent their client zealously, but
to be competent at all times and to also uphold a civic duty to the public.

**E. Defendants have a legal duty and obligation to ensure that every unit
is safe and hazardous free.**

22. Defendant while acting under color of law have failed to comply with state
and federal law that protect tenants rights to live in a habitable environment.
They have allowed Defendant Waters Edge Apartments, Defendant Weller
Management, Defendant David Gates, Defendant Nancy Crolley and
Defendant Marilyn Pumphrey to repeatedly violate tenants rights by leasing
out mold infested apartments while having knowledge of the mold due to it
being an ongoing problem. There have been several complaints made to the
City of Sandy Springs concerning mold not just at Waters Edge apartments

14

but other apartment complexes as well of which a few have made public
headlines, and none of the recent complaints are listed on Defendant City of
Sandy Springs website to be viewed including Plaintiff's.

**F. Defendants have a duty to adequately monitor and supervise all
advertising platforms of dwelling units to ensure truthful
information is being shown to the public.**

23. All Defendants have a duty to ensure that all advertising platforms are
contains truthful information in consumers view about their dwelling units,
even if it's negative. Not only is it unfair to the tenants who decide to rent,
but it's also unfair to the other apartment complexes in the area who actually
have luxury apartments.

**G. Defendants have failed to monitor and supervise advertising about
dwelling units.**

24. Defendants have failed to adequately monitor and supervise advertising
about their dwelling units on their website. Defendants are advertising
luxury apartments on their website, when in fact their apartments contain
mold.

**H. Defendant Adam Joffe, Defendant Goodman McGuffey and
Defendant Stephanie Glickauf owed the Plaintiff a reasonable duty
of care although they do not represent Plaintiff. All lawyers were**

15

**required to be competent and honest when dealing with Plaintiff demonstrate respect for the law and legal system; use the laws procedure for legitimate purposes and not to harass or intimidate and be truthful in statements to Plaintiff.**

25. Defendant Adam Joffe, Defendant Goodman McGuffey and Defendant Stephanie Glickauf breached their duty of care to Plaintiff Arnold by making false statements to Plaintiff and incorporating and affirming misrepresentations in statements that they knew were false. It was the duty of Defendant Goodman McGuffey and Defendant Glickauf to ensure that Defendant Adam Joffe was honest when dealing with Plaintiff and that all statements made to Plaintiff on his clients behalf was true and correct and do not violate Plaintiff's constitutional and or civil rights. While attorneys have a duty to their client they also have a duty to uphold the legal process. Defendant Adam Joffe violated Plaintiff's civil and or constitutional right to reasonable accommodations by stating that she was not authorized to make any accessible changes to the property, when in fact the Georgia tenant-landlord handbook, the lease and the Fair Housing and Americans with Disabilities Act gives her the right to make changes as well as fix repairs.

## COUNT I

## BREACH OF IMPLIED WARRANTY OF HABITABILITY

26. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

27. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant Weller Management, Defendant FC Hunters Glen, Defendant David Gates, Defendant Nancy Crolley, Defendant Marilyn Pumphrey, Defendant Adam Joffe, Defendant Goodman McGuffey, Defendant Stephanie Glickauf and Defendant Peachtree Mitigation have breached the Implied Warranty of Habitability by intentionally leasing a dwelling unit that they knew had black mold and forcing Plaintiff to remain in a unit without fully making required repairs for mold, further Defendants allowed fraudulent mold readings to be submitted to the City of Sandy Springs Code Code Enforcement. *See attached as Exhibit A.* Plaintiff has not been able to run the hvac unit on some of the coldest days of the winter season due to it possibly being contaminated with mold as it is in the same closet as the mold. Further, Plaintiff had to go to the emergency department due to constant headaches, fever, cough and anemia, which are all symptoms of mold. Defendants should have had reasonable knowledge of the condition of the unit before it was allowed to be leased. Although Defendant Weller

17

Management had just acquired Defendant FC Hunters Glen to manage, they
still had a duty and obligation to render due diligence to find out the
condition of the units before leasing them. Appropriate repairs should have
been made before it was allowed to be leased. However, that did not happen,
instead they leased it anyway which placed profit before the health, safety
and well being of the Plaintiff and the public, which places all Defendants in
violation and they are therefore liable, pursuant to O.C.G.A. § 44-7-13 and
other applicable laws. Plaintiff had begun the process to hire mold
professionals to come out and treat the mold, however once the technician
went to the leasing office and told management what he had found they
stopped him from making the repairs and told him they needed to contact
corporate. The repairs did not get completed until January 7, 2023,  which
means Plaintiff had to continue to suffer with mold side effects. O.C.G.A. §
44-7-2(b) prohibits landlords from waiving or avoiding rights, duties or
remedies  that may be placed in a lease or any other contract concerning
landlords duties to make repairs and improvements or a landlords liability
for failure to repair. After Defendant Peachtree Mitigation submitted its false
report to management and the City of Sandy Springs on January 4, 2023,
more active mold was found in the guest bathroom and under the kitchen
sink on two separate occasions. *Please see Exhibits N, R and Z.* Further, a

report from the Centers for Disease Control and Prevention states that dead

black mold can still cause allergic reactions. *See Exhibit A1.* Had Defendant

Peachtree Mitigation been honest in its report, it would have influenced the

other Defendants to make the proper and required repairs. As of April 3,

2023, Plaintiff is still suffering from side effects of mold due to repairs not

being made, when all Defendants need to do is either make the proper

repairs or allow Plaintiff to make the proper repairs. After being told that

Plaintiff could not make the necessary repairs, Plaintiff decided to look for

other places to stay, but none of them has been within the budget at Waters

Edge Apartments, however cheaper should not mean hazardous.

## COUNT III

## DENIAL OF REASONABLE ACCOMMODATIONS DUE TO DISABILITY

28. Each and every allegation of the Complaint is incorporated herein as if set
    forth in full.

29. By their actions, inactions, customs, practices, policies and procedures
    alleged herein, Defendant Weller Management, Defendant Adam Joffe,
    Defendant FC Hunters Glen, Defendant David Gates, Defendant Nancy
    Crolley and Defendant Marilyn Pumphrey had a duty to provide reasonable

19

accommodations to Plaintiff as promised. Defendants breached their duty by violating the Fair Housing Act, pursuant to 42 U.S.C. § 3601-3619; the Americans with Disabilities Act, pursuant to 42 U.S.C § 12101; and 42 U.S.C. § 12182; 24 C.F.R. § 8.33; O.C.G.A. § 8-3-202(a)(7)(B)(i)(ii) and other applicable federal and state laws by denying Plaintiff the opportunity to participate in services, facilities, privileges and accommodations. Plaintiff has not been able to leave the apartment to go anywhere due to the steps preventing her from leaving the property due to her using a wheelchair. Plaintiff requested a unit that was accessible without steps and was deceived intentionally and maliciously by management into thinking that the unit was accessible. When Plaintiff arrived on move in day the unit was not accessible and Plaintiff had to have help from several different people to get up the steps which was degrading and embarrassing, when she could have easily been given an accessible unit and gotten herself into her own unit using her wheelchair. *See attached as Exhibits E and F.* Plaintiff was willing to pay for reasonable accommodations to make it easier for her to access the apartment and the unit but was denied by Defendant Marilyn Pumphrey and Defendant Adam Joffe by telling Plaintiff that she was not authorized. *See Exhibit G.*

30. Plaintiff suffers from muscle weakness in her legs and feet. Not only was Plaintiff placed in an inaccessible unit, but she was also isolated and segregated by being placed in the back of the unit where she couldn't get to any of the services or amenities offered by the apartment complex without steps which is unsafe due to her not being able to walk. When Plaintiff began complaining about the mold and began making preparations to fix the mold problem herself, all of a sudden accessible units became available, however she was told that she couldn't move into that unit rent was paid via email from Defendant Nancy Crolley. Plaintiff has not paid rent due to having to pay for mold professionals, out of pocket repairs and to make reasonable accommodations which should have already been in the unit and was uncertain if a down payment would be needed. Even after the mold was found in her apartment, Plaintiff was still denied a new, mold free accessible apartment.

## COUNT IV

### UNJUST ENRICHMENT

31. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

32. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant Weller Management, Defendant FC Hunters Glen,

21

Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn Pumphrey induced Plaintiff to lease a dwelling unit under the impression that the unit was in good, livable and habitable condition and accessible when in fact the apartment unit was contaminated with black mold and non accessible as Plaintiff requested. Defendants have retained the financial benefit conferred by Plaintiff. All Defendants will be unjustly enriched in some way shape or form be it through local business taxes which pays their salaries or rental payments from tenants, and justice requires that they disgorge the benefit conferred by Plaintiff, pursuant to O.C.G.A. § 10-1-763 and other applicable laws. *See Exhibit T.*

## COUNT V

## VIOLATION OF THE FAIR BUSINESS PRACTICES ACT

33. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

34. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendants have violated the Fair Business Practices Act, pursuant to O.C.G.A. § 10-1-393 by using unfair and deceptive acts while conducting transactions by advertising apartments as if they are in habitable condition and ready to be leased, when in fact they are infested with black mold, which places tenants health at risk. Defendants made false

22

representations about their units as if they were new or luxury and of a

particular standard, quality, style or model, when in fact they were

deteriorated. Further, Black mold can cause breathing problems, anemia,

night sweats, fever, chills and in some instances death depending on how

long persons are exposed and symptoms go unnoticed and untreated. These

actions also caused Plaintiff to be confused as to the condition of the

apartment as the pictures on the website do not display black mold, but once

you're moved in you find black mold. Plaintiff trusted their skill to know

which apartments were ready to be leased and in habitable condition and

which ones were not. Defendant Weller Management, Defendant FC

Hunters Glen, Defendant David Gates, Defendant Nancy Crolley and

Defendant Marilyn Pumphrey intentionally and maliciously violated this act

to continue to make money off of placing tenants in inhabitable units with

full knowledge of the black mold problem. Defendants tried to paint over the

active black mold before Plaintiff arrived, but we're unable to finish. *See

Exhibit A.* Defendants have a legal and fiduciary duty to ensure that all

business transactions comply with state and federal laws. Defendant's have

breached their duties by advertising habitable units while leasing inhabitable

units infested with visible black mold. Defendants have a duty and

obligation to adequately monitor advertising to ensure that information about

23

their dwelling units are truthful. This violation is enforced through O.C.G.A

§. 10-1-399 and other applicable laws. *See Exhibits I, J and S.*

## COUNT VI

## VIOLATION OF THE UNIFORM DECEPTIVE TRADE PRACTICES ACT

35. Each and every allegation of the Complaint is incorporated herein as if set
forth in full.

36. By their actions, inactions, customs, practices, policies and procedures
alleged herein, Defendant Weller Management, Defendant FC Hunters Glen,
Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn
Pumphrey have violated the Uniform Deceptive Trade Practices Act,
pursuant to O.C.G.A. § 10-1-372 by leasing apartments as if they are in
habitable condition, when in fact they are infested with mold. Defendants
made false representations and advertisements as if their units were of a
particular luxury quality, when in fact their units were contaminated with
mold, which caused confusion to Plaintiff. Defendants knew the apartment
was contaminated with mold and leased it to Plaintiff anyway, which caused
breathing problems, headaches, nausea and vomiting. Due to Defendant's
actions it caused confusion to Plaintiff and misleading and false statements

24

of fact. Defendants have a legal and fiduciary duty to ensure that all business transactions are made in good faith and that they comply with federal and state laws. Defendants have breached their duties by leasing inhabitable units while advertising them as habitable. This violation is enforced through O.C.G.A. § 10-1-399 and other applicable laws. *See Exhibits I, J and S.*

## COUNT VII

## FAILURE TO PREVENT, WARN AND REVEAL

37. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

38. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant Weller Management, Defendant Waters Edge Apartments, Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn Pumphrey failed to prevent the growth of black mold, they failed to warn Plaintiff of possible mold on the website where you apply for the apartment, they failed to reveal in good faith that mold could possibly be in the units, instead they tried to conceal the mold by attempting to paint over it but was not able to finish due to Plaintiff's arrival. *See Exhibit A.* These warnings should have been placed in consumers' view on the website at the time of applying for the apartment, which was not done

which makes them liable and negligent under O.C.G.A. § 51-1-11; and

O.C.G.A. § 51-1-11.1. Defendants have a legal and fiduciary duty to place

warnings of mold in consumers view at first point of advertising which is the

website and it was not done. Even if the warning is in the lease, it still

violates and breaches the "Implied Warranty of Habitability". Plaintiff is

seeking damages for third party beneficiaries under O.C.G.A. § 11-2-318;

and O.C.G.A. § 11-2A-216 and other applicable laws. *See Exhibit J.*

## COUNT VIII

## PAIN AND SUFFERING

39. Each and every allegation of the Complaint is incorporated herein as if set
forth in full.

40. By their actions, inactions, customs, practices, policies and procedures
alleged herein, Defendant FC Hunters Glen, Defendant Adam Joffe
Defendant Weller Management, Defendant Waters Edge Apartments,
Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn
Pumphrey has caused Plaintiff both emotional and physical pain and
suffering directly due to their actions and or inactions. Defendants actions
were intentional, malicious and careless. They knew these units had toxic
mold, yet they placed profit before the well being of Plaintiff and the public

by leasing inhabitable units anyway. Plaintiff has suffered emotionally due to her feeling as if she was less than a human being by being placed in an inhabitable environment due to her being disabled. She has had crying episodes trying to understand why this would happen to her, which left her depressed. She also suffered physical injuries due to direct exposure to the black mold.

41. She suffered from headaches every day since moving in the apartment, nausea, vomiting and anemia, coughing and breathing problems, which are all symptoms of black mold exposure according to the Centers For Disease Control and Prevention. Plaintiff also has not been able to enjoy the amenities of the apartment complex nor has she been able to leave her apartment due to being in an apartment accessible with steps after she requested an apartment without steps. Plaintiff is seeking damages for this count under O.C.G.A. § 9-10-184 and other applicable laws.

## COUNT IX

## FALSE AND FRAUDULENT STATEMENTS IN ADVERTISING

42. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

27

43. By their actions, inactions, customs, practices, policies and procedures
alleged herein, Defendant FC Hunters Glen, Defendant Weller Management,
Defendant Waters Edge Apartments, Defendant David Gates, Defendant
Nancy Crolley and Defendant Marilyn Pumphrey breached their duty to
comply with state and federal laws as well as breached their duty to Plaintiff
by ensuring that all statements made in any form of advertising is true and
correct and does not deceive the public in any way. Defendants have made
and or allowed to be made false and fraudulent statements in advertising by
inducing Plaintiff with pictures and writings to make her believe that she
was moving into a luxury apartment, when in fact she was moving into an
apartment with mold that management knew about. *See Exhibits A and J.*
The pictures on the website does not show any form of mold, neither is there
a disclaimer of mold on the website which is the first point of contact for
potential residents to apply. Because of these actions and or inactions
Defendants have violated O.C.G.A. § 10-1-421, enforced by O.C.G.A. § 10-
1-423 and other applicable laws.

## COUNT X

## BREACH OF EXPRESS WARRANTY

44. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

45. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant FC Hunters Glen, Defendant Weller, Defendant David Gates, Defendant Nancy Crolley and Defendant Marilyn Pumphrey have a duty to ensure that all warranties comply with state and federal law, pursuant to O.C.G.A. § 11-2-313; O.C.G.A. § 11-2-718 and other applicable laws. Defendants have breached both state and federal express warranty laws by knowingly leasing out inhabitable units to tenants infested with mold and peeling paint while advertising luxury apartments on their website. *See attached as Exhibits A and J.*

## COUNT XI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

46. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

47. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant Weller Management, Defendant Adam Joffe Defendant David Gates, Nancy Crolley and Defendant FC Hunters Glen, Defendant Adam Joffe, Defendant Goodman McGuffey and Defendant Stephanie Glickauf has subjected Plaintiff to intentional infliction of emotional distress by allowing Defendant Nancy Crolley to harass Plaintiff in which Plaintiff has suffered a pecuniary loss. Due to the actions of lying, deception and manipulation by Defendant Nancy Crolley, Plaintiff notified Defendant Nancy Crolley via email that she no longer wanted to communicate with her at all and that it would be a good idea only to communicate directly with the property manager or her boss Defendant David Gates or any of the higher ups. *See attached as Exhibit V.* After knowing this, Defendant Nancy Crolley maliciously and intentionally showed up at Plaintiff's door with the property manager and maintenance supervisor on February 8, 2023 and not only invaded Plaintiff's privacy by recording her apartment, but also continued to lie about mold in the apartment. Because Defendant Nancy Crolley is listed as a Defendant in this lawsuit and they have retained an attorney, Plaintiff legally cannot communicate with Defendant Nancy Crolley. Plaintiff did not want to cause

a scene to the other neighbors by getting upset or arguing with Defendant

Nancy Crolley and asking her to leave.

48. Plaintiff has suffered a pecuniary loss due to not being able to sleep,

thinking that Defendant Nancy Crolley will be allowed to do this again, and

also thinking that Defendant Nancy Crolley may cause her physical harm.

Plaintiff then informed Defendant Adam Joffe of the situation and informed

him that Defendant Nancy Crolley is not a maintenance crew member and

that she had no business in my apartment, Defendant Adam Joffe then stated

that Plaintiff was not to obstruct them from doing their job and that

Defendant Nancy Crolley had every right to enter Plaintiff's apartment.

Plaintiff ensured Defendant Joffe that she was not obstructing them from

doing their job but Nancy was not welcomed in my apartment. *See attached*

*as Exhibit W.* The leak was fixed and the maintenance supervisor took

pictures of the apartment himself, so the fact that Defendant Nancy Crolley

felt the need to come and take pictures is nothing more than harassment.

Defendant Nancy Crolley only did this due to Plaintiff not being able to fully

prevent her from coming through her door due to her being in a wheelchair.

This count is enforced through O.C.G.A. § 51-12-4.

## COUNT XII

## BREACH OF LEGAL DUTY

49. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

50. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant Adam Joffe, Defendant Goodman McGuffey and Defendant Stephanie Glickauf owed Plaintiff a reasonable duty of care to be truthful when making statements, be competent and honest at all times, respect the legal process and use the laws procedures for legitimate purposes and not to harass, intimidate or delay or cause burden. Defendant Adam Joffe has made misrepresentations in his written statements by stating that Plaintiff is not authorized to make handicap adjustments or repairs for mold to the apartment, when in fact the Fair Housing Act, 24 C.F.R. § 8.33 and O.C.G.A. § 8-3-202(a)(7)(B)(i)(ii) and the Georgia Tenant Landlord Handbook gives and protects the rights of Plaintiff to make accommodations to her apartment due to her handicap and courts have recognized "repair and deduct". Defendants have also allowed and assisted in harassment of Plaintiff, which goes against the Georgia Bar Rules of Professional Conduct. Plaintiff is disabled and required the doors to be widened for easy access to the bathroom and the closet, and bars to be placed in the bathtub to prevent

falling. Defendant Goodman McGuffey and Defendant Stephanie Glickauf had a duty to Plaintiff to ensure that Adam Joffe respected the law and conform to the Georgia Bar Rules of Professional Conduct. A lawyer that is a partner, manager or a supervisory lawyer shall be responsible for another lawyers violation, pursuant to the Georgia Rules of Professional Conduct. Although Adam Joffe does not represent Plaintiff, he still had a reasonable duty of care to her as well as to the public. (See Biakanja vs Irving).

51. This count is enforced through O.C.G.A. § 51-1-6. Due to Defendant Adam Joffe, Defendant Goodman McGuffey and Defendant Stephanie Glickauf being licensed attorneys, they should have had reasonable knowledge of Plaintiff's right to make reasonable accommodations to her apartment. *See Exhibits G, V and W.*

## COUNT XIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

52. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

33

53. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant FC Hunters Glen, Defendant Weller Management, Defendant David Gates, Defendant Nancy Crolley, Defendant Marilyn Pumphrey breached an implied warranty of merchantability by leasing an inhabitable unit to Plaintiff. Defendants had a duty owed to Plaintiff to provide goods that were merchantable. In order for goods to be merchantable they must be "fit for the ordinary purposes for which goods are used" and conform to the promise or affirmations of fact", pursuant to U.C.C. § 2-314; and U.C.C. § 2A-212 and other applicable laws. The unit that was leased to Plaintiff was not merchantable due to it being infested and contaminated with black mold. The unit should have not been leased until all repairs were made by removing all mold from the unit. Dead mold can still cause allergic reactions according to the Center for Disease Control and Prevention. As of April 3, 2023, the mold still remains in the unit. *Please see Exhibits A and J.*

## COUNT XIV

## BREACH OF EXPRESS WARRANTIES BY AFFIRMATION, PROMISE, DESCRIPTION OR SAMPLE

54. Each and every allegation of the Complaint is incorporated herein as if set forth in full.

55. By their actions, inactions, customs, practices, policies and procedures alleged herein, Defendant FC Hunters Glen, Defendant Weller Management, Defendant David Gates, Defendant Nancy Crolley, Defendant Marilyn Pumphrey breached express warranties, pursuant to U.C.C. § 2-313 by advertising luxury apartments, when in fact the apartments were contaminated and infested with active black mold which was hazardous to Plaintiff's health. Express warranties are created by "any affirmation of fact or promise made by the seller to the buyer" or "any description of the goods which is made part of the basis of the bargain". The description and affirmation of the unit was promised as luxury, while the actual unit was hazardous due to black mold. The Centers for Disease Control and Prevention states that dead mold can still cause allergic reactions. As of April 3, 2023, the black mold still has not been removed from the unit. Enforced under U.C.C. § 2A-216 and U.C.C. § 2A-519; U.C.C. § 2A-520. *See Exhibits A and J.*

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff respectfully prays that this Court grant the following:

A. Grant Plaintiff compensatory damages;

B. Grant Plaintiff punitive damages in the amount of $250,000,000

C. Grant Plaintiff injunctive relief, pursuant to O.C.G.A. § 4-13-8.

D. Grant Plaintiff damages to third party beneficiaries

E. Grant Plaintiff such other relief that the Court deems just and proper

Respectfully submitted this 23rd day of April 2023.

Kimberly Arnold
8601 Roberts Drive
Apt 8-11
Sandy Springs, GA 30350
27.kinberlyarnold30@gmail.com
770.966.6437

37

Exhibit List

Exhibit A- Electronically Stored Information-Pictures sent via email to Marilyn Pumphrey and Eridrick Coleman on November 27, 2022.

Exhibit B-OnEighty Solutions Findings

Exhibit C-Complaint of James Wright

Exhibit D-Renew at Sandy Springs news article

Exhibit E-Emails of Eridrick Coleman apologizing (to be used as an admission during discovery)

Exhibit F- Electronically stored information-Recording of Nancy Crolley

Exhibit G-Reviews about Mold

Exhibit H-Adam Joffe email denying Plaintiff to make adjustments adjustments

Exhibit I- Electronically stored information-Other Pictures of the unit

Exhibit J-Advertising luxury apartments

Exhibit K-Mitigating Emails

Exhibit L-Attorney Letter

Exhibit M-Electronically stored information-More mold pictures

Exhibit N-Electronically stored information-More mold under sink in 2nd bathroom

Exhibit O-Email to Marilyn Pumphrey

Exhibit P-Electronically stored information-Recording of first mold professional to do assessment

Exhibit Q-Payment receipts from mold companies

Exhibit R-Electronically stored information-Recording of maintenance crew discovering new mold on January 24, 2023

Exhibit S-Electronically stored information-Pictures from website

Exhibit T-Money order receipt from November 25, 2022.

Exhibit U-Electronically stored information-Painted over mold picture in hallway

Exhibit V-Email to Nancy Crolley

Exhibit W-Email to Attorney Adam Joffe about Nancy Crolley

Exhibit X- Electronically stored information-mold under kitchen sink

Exhibit Y-Electronically stored information-mold in kitchen cabinet

Exhibit Z-Peachtree Mitigation Report

Exhibit A1-Centers for Disease Control and Prevention report about dead mold still causing allergic reactions.

Exhibit A2-Demand Letter

Exhibit A3- Air Allergen Mold Report

Exhibit A4-Sworn Affidavit of Kimberly Arnold

Exhibit A5- *(Reserved)*

Exhibit A6- *(Reserved)*
Exhibit A7- *(Reserved)*

Exhibit A8- *(Reserved)*

Exhibit A9- *(Reserved)*

Exhibit A10- *(Reserved)*

EXHIBIT A

EXHIBIT B

**Estimate**

| | |
|---|---|
| ESTIMATE # | 14026 |
| DATE | 12/30/2022 |

## ONEighty Solutions Inc.

849 Pickens Industrial Dr Ste 16,
Marietta. GA
30062

Ph 678-274-6511
info@oneightysolutions.com
http://www.oneightysolutions.com

| BILL TO | | JOB ADDRESS | |
|---|---|---|---|
| | Kimberly Arnold
8601 Roberts Dr
Sandy Springs, GA 30350 | | 8601 Roberts Dr
Sandy Springs, GA 30350 |

DESCRIPTION

**Evaluation for Microbial growth located in the utilities room**

*Please call 30 mins before arriving on the property*
Building#: 8
Door #: 11
*Enter Water's Edge Apartments and keep right. 1st building on the right*

Microbial growth all throughout the entire unit. Most of the drywall that is affected has to be removed. The water source appears to be from a leaky water heater at one time that was never mitigated properly. It appears the mold has just been painted over and not handled properly. that's why it keeps coming back. We must treat the entire unit for cross-contamination to reduce the amount of spores, after the drywall has been removed and the mold is cleaned. The water heater will have to be removed by the management group and reinstalled. This price is strictly for mitigation only and no rebuild.

| ITEM | QTY | UNIT PRICE | AMOUNT |
|---|---|---|---|
| **Evaluation**
Visual evaluation of the structure. Written evaluation showing the issue and the recommended treatment for remediation of the odor. The evaluation fee is credited back towards the job when the work is complete. | 1 | $95.00 | $95.00 |
| **PartialInvoice**
Partial invoice #14026A | -1 | $95.00 | $-95.00 |
| **MRL2**
Setup proper controls in the structure. This helps to control the environment during remediation. Spores are released while the remediation is taking place and it is vital to control the environment in remediation.
o      HEPA Air Scrubbers
o      Dehumidifier
o      Containment
o      Containment zipper door | 1 | $4,500.00 | $4,500.00 |

Remove all affected drywall that has been affected by water damage. All affected materials will be disposed of offsite in a properly.

MicroClean all visible microbial growth by wiping down all affect areas that can be seen with microbial growth, this includes but not limited to.
o      HEPA vacuum
o      Spray, scrape and wipe down all visible mold

Mechanical scrub the entire structure with our proprietary BIOSWEEP process.

High intensity Phocatox technology eliminates airborne and surface organic molecules and microorganisms. This multi-phase process utilizes
1.      HEPA filtration
2.      Hydroxyl radical production
3.      Purified O3 and vaporized gas-phase hydrogen peroxide (H2O2) production
4.      Singlet oxygen and oxyradical plasma production
5.      Sterilizing germicidal UVC radiation

Thermal fog agent for mold spore removal is required to ensure best possible results for IAQ.
Antimicrobial is applied to remediated areas to help reduce the risk of future growth.

Price does not reflect any rebuild cost. All rebuild cost will be additional.

|  |  |
|---|---|
| SUBTOTAL | $4,500.00 |
| PROCESSING FEE | $0.00 |
| TOTAL | **$4,500.00** |

### Disclaimers

**Our Air and Surface Decontamination treatments permanently removes odors and is an industry leading indoor air and surface decontamination technology. No claims can be made regarding potential efficacy of our treatments against COVID-19. This is because there are currently no means of approved testing or validation of any products or services against Covid-19.**

**ONEighty Solutions air and surface decontamination is an additional step to reduce the risk of viruses and bacteria NOT to be used as a replacement for proper cleaning and disinfection protocol. This is not to be used as a replacement for the cleaning with disinfectants that has been given by the CDC.**
**No warranty or guarantee or certification can be offered with any of our air and surface decontamination treatments.**

**This is a preliminary Estimate, ONLY. Final invoice will be based upon the actual labor and materials required to complete the work.**
**This estimate does not include the costs associated with reconstruction and finish work; any mold testing services. Although this assessment is made in good faith, it is ONLY an estimate. Once work begins, if damage is determined to be more or less extensive than estimated, the final cost for mitigation services may be or less than the estimate provided.**

### TERMS AND CONDITIONS

1. I agree to allow ONEighty Solutions Inc to complete the work listed above at the address listed above.

2. I agree all persons, pets, and live plants have been removed from treatment area.

3. I agree absolutely no persons (including myself) or pets will enter treatment area before Customer Re-Entry Date & Time listed above. I assume all responsibility and hold ONEighty Solutions harmless for any breach of this requirement.

This Service Agreement for treatment of indoor air and odor (hereinafter referred to as the "Agreement", entered by and between the customer named above "Customer" and ONEighty Solutions dba BIOSWEEP OF GREATER ATLANTA (Provider) provides for indoor air and odor treatment by Provider as defined and under the terms set forth. Customer acknowledges that Customer has read,

understands and agrees to the terms contained on the front and back of this Agreement. This service estimate is valid for 5 business days and is based on the actual indoor and/or odor conditions at the time of visual inspection and/or air sampling analysis.

QUALITY SERVICE GUARANTEE. If Customer, notifies Provider by written notice within 5 days that they are not satisfied with the results of the treatment as defined in this contract, Provider will address your concerns within 10 business days.

SERVICE WARRANTY. Mold Remediation: Limited 3-year warranty is provided with all mold remediation treatment. This warranty limits are as follows: water is reintroduced to the dwelling, the source has not been removed, humidity levels are higher than 55% at any given time, The HVAC system is not used properly and has not had regular maintenance done. If any of these are found out after the treatment is completed, then the warranty will be voided.

4.      **SERVICES PROVIDED**. Provider will conduct a thorough visible inspection of the property for evidence of mold, mildew, odor or other odor-causing agents and will conduct (if requested) air sampling to further assess indoor air quality. Provider will review air sample analytical results and provide treatment of property indoor air using Provider's proprietary technology to eradicate airborne organic contaminants and other odor- causing agents. If required, Provider will pre-treat contaminated surfaces using a nontoxic, biodegradable proprietary cleaner as needed.

5.      **CUSTOMER'S OBLIGATIONS**. Customer acknowledges Provider's technology generates advanced PCO, if exposed to during the treatment process, may be harmful to the respiratory systems of all living things. Therefore, Customer agrees to vacate the property of all living things for the duration of treatment and to prevent their re-entry into the property during treatment. Provider will designate the exact date and time Customer may safely re-enter the property after treatment. Customer Re-entry Date and Time is listed on the first page of this Agreement. Customer further agrees to prevent re-entry of any living thing into the property prior to completion of treatment. Customer agrees to remove all live plants from property prior to treatment. Customer agrees to adequately cover all aquariums, turning off all aquarium pumps, motors and /or filtration equipment prior to treatment of property. Re-entry to the property prior to the Customer Re-Entry date voids the Quality Service Guarantee and may result in additional service times and charges. In the event the Provider is denied access to the property at the time of service, the Customer is responsible to pay a service charge of $295.00 if we are not notified 24 hours in advance of the appointment.

6.      **PERFORMING THE WORK**. Provider will exercise reasonable care while performing any work, to try to avoid damaging any part of the property. Under no circumstances or conditions shall Provider be responsible for damage caused by Provider at the time the work is performed unless those damages result from gross negligence on the part of Provider.

7.      **CHANGE IN LAW**. This Agreement shall be interpreted, regulated and adjudicated in accordance with applicable federal state and local laws and regulations, as they exist at the time this Agreement is executed. Should any federal, state or local law or regulation be changed regarding Providers services or treatment, Provider may take whatever steps are necessary to comply with said laws.

8.      **LIMITS OF LIABILITY**. In no event, shall Provider, its owners, any officers, directors, employees, agents or affiliates be responsible for indirect special, nominal, incidental, punitive, or consequential losses or damages or for any penalties, regardless of legal or equitable theory accreted, including contract, negligence, warranty, strict liability, statute or otherwise, even if it had been aware of the possibility of such damages or they are foreseeable; or for claims by third party.

9.      **NON-PAYMENT**. Customer will pay Provider's invoice upon completion of service or receipt of invoice. In the event legal action is necessary to collect any amount owed Provider, Provider shall be entitled to recover from Customer all reasonable costs of collection including reasonable attorney's fees and expenses, in addition to any outstanding amount due Provider. In addition, interest at the rate of 1.5% per month, being 18% annually or the highest rate allowed by applicable law will be assessed on any past due amounts owed by Customer until paid. Consent is hereby given for filing of mechanics leans by provider for the work described in this contract on the property on which the work is performed if the provider is not paid.

10.     **ENTIRE AGREEMENT**. This Agreement, together with attachment(s), if any, signed by Provider and Customer constitutes the entire Agreement between the parties and no other representation or statements, whether oral or written, will be binding upon the parties.

11.     **NOTICE OF CLAIMS, ACCESS TO PROPERTY**. Any claim under the terms of the Agreement must be made immediately in writing to Provider. Provider is only obligated to perform under this Agreement if Customer allows Provider access to the identified property for any purpose contemplated by the Agreement, including but not limited to re-inspection, whether the inspection was requested or considered necessary by Provider.

12.     **SEVERABILITY.** If any part of the Agreement is held to be invalid or unenforceable for any reason, the remaining terms and conditions of the Agreement will remain in full force and effect.

13.     **BINDING ARBITRATION**. With the exception of litigation for non-payment by customer, in the event of a dispute between Provider and/or its employees and Customer arising out of or relating to this Agreement, or to the identified property in any way, whether by virtue of contract, tort, or otherwise, including but not limited to the interpretation of the terms and conditions of this Agreement, the making of the Agreement, or breach of any provision of this Agreement, the parties hereby expressly agree to submit their dispute to binding arbitration for resolution in accordance with rules and requirements of the American Arbitration Association. The parties acknowledge and understand that by agreeing to submit their dispute to binding arbitration they are effectively waiving their right to trial by jury as a means of resolving disputes. The arbitration shall be held in Canton, Georgia unless mutually agreed otherwise. Furthermore, the parties acknowledge that they desire to arbitrate any disputes arising from this agreement to resolve such dispute(s) quickly and avoid the costs of litigation. Judgment upon such arbitration award may be entered in Canton, Georgia. Each party shall be responsible for paying any attorney's fees, expert witness' fees and other expenses it incurs on its behalf relating to the

arbitration, plus one half the arbitrator's fee and one half on any expenses incurred by the arbitrator, and the award shall the arbitrator's fee and expenses accordingly.

14.    **SPECIFIC EXCLUSIONS**. The Agreement does not cover, and Provider will not be responsible for, 1) any future airborne contaminates or odor-causing agents or any medical or legal action taken by anyone associated with entering or staying in the property, and 2) personal expenses such as lodging, meals, transportation etc. incurred because of treatment, re-treatment and/or damage repair.

15.    **CHOICE OF LAW**. This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia.

<div style="display:flex">

Robert Averette
Owner ONEighty Solutions

Client Signature
Responsible Party

</div>

# Air Allergen & Mold Testing

Atlanta Mold & Air Quality Testing for Allergy & Asthma Relief

*1543 Lilburn Stone-Mountain Road*

*Stone Mountain, GA 30087*

*(770) 938.4861 Fax (678) 723.5848*

## INVOICE

| Customer | | Billing Date: | 1/23/2023 |
|---|---|---|---|
| Company: | | | |
| Name: | Kimberly | Arnold | |
| Addr1: | 8601 Robert Drive | | |
| Addr2: | Apt 8-11 | | |
| City: | Atlanta | GA | 30350- |

| Job/Location | Date of Service | 12/16/2022 |
|---|---|---|
| Invoice Nbr: | 34682 | |
| Compy Job: | | |
| LastName: | Arnold | |
| Addr1: | 8601 Robert Drive | |
| Addr2: | Apt 8-11 | |
| City St | Atlanta GA 30350 | |

| Qty | Description | Unit Price | Extended Price |
|---|---|---|---|
| 1 | Courtesy Credit | -69.00 | -69.00 |
| 1 | Swab for Culture (utility c. w | 0.00 | 0.00 |
| 1 | Adj | -14.00 | -14.00 |
| 1 | Swab Direct Exam | 69.00 | 69.00 |
| 2 | Spore Trap | 69.00 | 138.00 |
| 1 | Inspection Report | 275.00 | 275.00 |
| | | SubTotal | 399.00 |
| | | Tax | 0.00 |
| | | Paid | 201.00 |
| | Pay Status: Partial Payment | Total | 198.00 |

*Invoice Notes:* *1/23/2023 12:13:17 PM By Carolyn: credit card declined.*
*1/16/2023 1:15:20 PM By Carolyn: $198 declined.*
*1/9/2023 3:08:59 PM By Julian:*
*Client called to state she will pay on Friday.*

*1/9/2023 1:52:09 PM By Carolyn: Declined for $198.*

*12/16/2022*

*Thank You for your order*

EXHIBIT C



5:54

Code Case Number: PM-000004-2019

Code Case Details | Tab Elements | Main Menu

**Code Case Type:**

Property Maintenance

**Opened:**

01/17/2019

**Closed:**

02/19/2019

**Status:**

Closed

**Project Name:**

**District:**

Council District 1

**Assigned To:**

Hampton, Marcellus

**Description:**

James Wright (678-428-2747) Resident lives at Waters
Edge Apartment (8801 Roberts Dr unit ) called to report
mold issues caused by hot water heater leak. Resident is
worried about what could be growing behind the wall.
He stated that management is taking too long to follow
up on issues. Resident would like a call back to follow up.

AA   🔒 build.sandyspringsga.gov   ↻

EXHIBIT D

11:46

     

**NORTH FULTON COUNTY**

By Adrianne Murchison, The Atlanta Journal-Constitution

Oct 1, 2020

Advertisement



The Atlanta Journal-Constitution is providing this content as part of our public service mission. Please support real, local journalism by subscribing today.

Several residents at a Sandy Springs apartment complex said property management ignored or prolonged mold problems. Two recent tenants also said mold problems prompted them to break their leases at ReNew Sandy Springs.

Jonathan Leonard said he paid a mold remediation company $300 to evaluate his apartment in August. The consultant said he found high levels of mold in the bedroom closet and areas of concern in the living room and hallway.

Advertisement



AA    🔒 ajc.com    ⟳



Leonard, an executive chef, said he moved into his apartment in 2018 and moved out Wednesday by exercising a clause in his rental agreement. He said the apartment property refused to accept the Full Spectrum Cleaning Solutions assessment.

*Article continues below*



By Kroger

ADVERTISER CONTENT

Can you answer all 10 of these Black history questions?

"If my living environment is uninhabitable, which it is with toxic mold, I can give them written notice and seven days to fix it," he said.

ReNew Sandy Springs and Trinity Property Consultants which manages the apartment complex didn't responded to several phone calls and emails from The Atlanta Journal-

11:47

     

Constitution, as well as a visit to the apartment leasing office. The apartment complex is located in the north end of the city.

ADVERTISING 

 **Yamaha Outboards**
Sponsored

IT'S ON—The Power into Spring Sales Event now through 3/31/23.



YAMAHAOUTBOARDS.COM
**SPRING SALES EVENT**

LEARN MORE

🔒 ajc.com





Recourse for unresolved mold complaints can be tricky. Sheena Haynes, district communications director at Fulton County Board of Health said the county and state don't have regulations for apartment mold.

Sandy Springs Code Enforcement Manager Yvonne Shaw said the department follows-up on mold complaints from apartment residents.



While there are no standard regulations for mold, she said the city has sanitary and property maintenance codes that apartment properties must follow.

Advertisement



Salvatore Ferragamo     Santoni

$232.5               $285.19

"If a resident is concerned about a growth or they see a spot on their ceiling or on their floor, we would send in an inspector to take a look at it," Shaw said.

If the inspector saw mold and violations of city codes they would issue a notice for the problem to be repaired, Shaw said. In the past when property owners haven't complied and fixed a problem, the city has taken them to court, she added.

"We can make the case based on our pictures and based on our findings and looking at those



different systems or whatever the case is and present that to the judge," Shaw said. "And usually that's helpful in winning the case."

But the ReNew Sandy Springs residents that talked with the AJC said they didn't know the city could help with their mold problems.



Leonard and his neighbor Daryl Henley, said



frequent turnover of property management companies has exacerbated mold issues. Staff encouraged them to stay promising things would improve, they said.

"Every time our lease was almost over, they switched companies," Henley said. "The new company would say, 'Sir just give us a chance. We are going to make sure everything is right.' No matter how many times we complained to corporate they always treated us like a nobody."

Henley said there's been recurring water leaks in his apartment since his family moved to ReNew in 2017 starting with a wet carpet. Someone came in to vacuum and clean the carpet after a month of requests, he said.

The cause of the leak was found in 2018 behind the wall of the shower in the bathroom, Henley said. It was repaired but the leak returned and spread to his son's bedroom closet where mold formed on the ceiling, he added. It was repaired but Henley said he worries that it's only a temporary fix.


‹ Caption

11:48 ⌄

☰   f   🐦   𝒫   📷   ✉   💬



‹ Caption

Raymond Monasterio said his family moved to ReNew in 2016. He was allowed to relocate to another unit in the building last October due to heavy mold, he said.

But Monasterio soon had mold problems in the new apartment. A leak in the air conditioning went unaddressed for seven months, he said, after he reported it to the leasing office in December. Photos appear to show mold in

🔒 ajc.com



several areas of the apartment.

Monasterio said mold formed in the bedroom, bathroom and closet and hindered his breathing. Maintenance crews came into the apartment in July to apply a bleach spray and other chemicals, he said, and left two machines for days to address the problem.

Monasterio said he and his wife broke their lease and moved to Alpharetta on Aug. 7 after a dispute over a transfer fee from the first apartment. The fee, which Monasterio disputed, increased from about $200 last October to nearly $6,000, he said.

Despite the clause in his lease, Leonard said he expects ReNew to present him with a high bill as well for breaking the rental agreement.

"Even if they screw me, I don't want this to keep affecting other people," he said. "This is affecting other people's health."

## About the Author



**Adrianne Murchison**

     

"Even if they screw me, I don't want this to keep affecting other people," he said. "This is affecting other people's health."

## About the Author



### Adrianne Murchison

Adrianne Murchison covers local government in north Fulton County for The Atlanta Journal-Constitution.

## Editors' Picks



## BREAKING: Microsoft confirms it's pausing plans for 90-acre Westside hub

47m ago

UGA football official present as crash

🔒 ajc.com

EXHIBIT E



M Gmail                                              **Kimberly Arnold <27.kimberlyarnold30@gmail.com>**

---

### Welcome
24 messages

---

**Eridrick Coleman <assistant@watersedgeapts.com>**                    Mon, Nov 21, 2022, 2:50 PM
To: 27.kimberlyarnold30@gmail.com <27.kimberlyarnold30@gmail.com>

**Eridrick Coleman**
Assistant Manager I Waters Edge

assistant@watersedgeapts.com I www.watersedgeapts.com

8601 Roberts Drive, Atlanta GA 30350

o 770.594.7499

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the fu ture.

Welcome Letter-Arnold 8.11.docx

---

**Kimberly Arnold <27.kimberlyarnold30@gmail.com>**                    Sun, Nov 27, 2022, 12:58 PM
To: Eridrick Coleman <assistant@watersedgeapts.com>

Good afternoon,

I'm gonna get straight to the point. I do realize that the condition of this apartment is not one person's fault, however it's completely unacceptable. While I know that these apartments are not newer apartment homes, there is no excuse at the condition of these apartments. First, I requested a first floor apartment that didn't have any steps to access the apartment

only due to my disability, I was told that none of the apartments were accessible without steps, which is not true. Second, I moved my move-in date twice for you guys' paperwork's sake, I didn't complain. Third, even though I locked the apartment in at $1183 which is clearly visible on the website, it shows that someone went into the system and changed/overrode the price from $1183 to $1283, which is now a total of $1421 after all of the additions are applied. I didn't complain. When I got here and paid my prorated rent the apartment wasn't even ready. The maintenance crew was still working on the blinds, the furnaces and a leak in the bathroom which is still leaking today I'm assuming due to it raining last night. Then, I was told to put the electricity in my name prior to move-in. I did and the for some odd reason the system is showing "no usage". Further, upon moving in we found that the dryer isn't working AT ALL, which is included in the rent. Also, while trying to connect my WiFi and Cable, I found that NONE of the connection outlets are working. This apartment should have never been allowed to be occupied due to all these problems. I'm kind of feeling like I'm paying for a remodeled apartment while living in a unremodeled apartment which is not fair to me nor is a good business practice. After reading the reviews I wanted to give these apartments a chance anyway, then I found other well kept, newer apartments in the area for the same price or a few hundred dollars more. So, I know I originally stated that I didn't want to live anywhere else due to me already being settled and it's kind of hard trying to find people to help me move to another location that don't work during the day, but I will make those arrangements. I want to be placed in another unit where everything that is supposed to be working is working. Then, while trying to find out where the leak was coming from in the bathroom, I found black mold where the hot water heater is. Like, this is extremely both unsafe and ridiculous.
[Quoted text hidden]

---

**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>
To: <manager@watersedgeapts.com>

Sun, Nov 27, 2022, 1:01 PM

[Quoted text hidden]

---

**Eridrick Coleman** <assistant@watersedgeapts.com>
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>
Cc: Marilyn Pumphrey <manager@watersedgeapts.com>

Mon, Nov 28, 2022, 7:44 AM

Good morning,

I truly apologize for the inconvenience that has been caused to you. What would be a good time for me to give you a call to discuss your concerns so that we can continue to make the effort where you can would be comfortable calling Waters Edge your home.

**Eridrick Coleman**
Assistant Manager I Waters Edge

---

assistant@watersedgeapts.com I www.watersedgeapts.com

8601 Roberts Drive, Atlanta GA 30350

o 770.594.7499

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the fu ture.

**From:** Kimberly Arnold <27.kimberlyarnold30@gmail.com>
**Sent:** Sunday, November 27, 2022 12:58 PM
**To:** Eridrick Coleman <assistant@watersedgeapts.com>
**Subject:** Re: Welcome

**[ EXTERNAL ]**

[Quoted text hidden]

---

**Eridrick Coleman** <assistant@watersedgeapts.com>                                    Mon, Nov 28, 2022, 9:58 AM
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>
Cc: Marilyn Pumphrey <manager@watersedgeapts.com>

Good morning,

Thanks so much for taking the time to speak with me this morning. Per our conversation you agreed to remain in unit #08-11. I advised you that the following items will be completed to ensure that you have a comfortable stay here at Water's Edge. The amount that was quoted to you at the time of application has been adjusted to reflect in your lease agreement. I have emailed you the new lease for your signatures. I will have maintenance to check your water heater regarding the leak as well as rectify that problem. We are going to have the utility closet repainted. Your dryer will be replaced with a working one.

Once again please accept my sincere apologies for the issues that you have had from your move-in. If you have any more questions or concerns please feel free to contact me.

Kind Regards,

**Eridrick Coleman**
Assistant Manager I Waters Edge

EXHIBIT F

EXHIBIT G



**Mercedes Ramanathan**
9 reviews · 5 photos

 2 months ago

Black mold in the units. I toured and left, Got dizzy on the ride home and ended up with a 102 fever and mild respiratory infection. They did not refund our app fees so we are taking Mary and Marilyn and Eldrick the leasing agents to small claims for lying about the unit condition for over a month, saying the mold was treated, and endangering our health. The lawyer has already told us this is illegal to list something as ready to be sold when it literally has mold in every closet. Be safe as this place is dangerous

 2    

**Waters Edge Apartments (Owner)**
2 months ago

Hi Mercedes. Although you did not move into our community, we take this feedback seriously and want you to know that we have taken all steps and precautions to ensure our residents' safety. The apartment home was inspected thoroughly and there was no visible evidence anywhere. Moisture readings will be taking place today and your refund has been processed. We wish you the best in your apartment search. -The Team at Waters Edge Apartments

🔒 Q waters edge apartments

1:45

 **Moji Olayinka**
20 reviews · 2 photos

★ ☆ ☆ ☆ ☆   5 months ago

Lived here for 2 years and initially it was beautifully decent. Then management changed twice this year. Absolute worst. Emails, calls, and face to face conversations ignored. Had to get a contractor to fix both tubs since they failed to do so since April. Whole building No A/c for 2 months with it reaching 100degress. No access to gym or pool for 2 years. Water turned off whenever . No notice of this new manager. Had to contact a higher up to get access to the online portal. And now they're trying to give us a notice to pay ; no AC in summer months in Georgia is unlawful. You do not have to pay under the CARES act. *~~to my fellow residents living here now . I thought it was just my building ~~*Again no A/c for 2 months in the summer in Georgia! And this is not even half of it. Lease can't be over soon enough. Don't apply here or with this property!!!

Update: 7/26 spoke to mary. she was no help was clueless on everything pretended like every building's ac was never out and the property manager has been m.i.a for months. Still have unfinished services. THE WORST MANAGEMENT I MEAN SLUMLORDS.

👍 3   ＜

 Waters Edge Apartments (Owner)
5 months ago

Moji, please give our office a call directly so we can address these matters. Thank you. -The Team at Waters Edge Apartments

🔒 Q waters edge apartments

EXHIBIT H

 Gmail

**Kimberly Arnold <27.kimberlyarnold30@gmail.com>**

## MORE MOLD

**Adam C. Joffe** <AJoffe@gm-llp.com>                                                                                  Tue, Mar 7, 10:39 AM
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>, ASH@hhs.gov <ASH@hhs.gov>, Ellis, Bob
<Bob.Ellis@fultoncountyga.gov>, Eridrick Coleman <manager@watersedgeapts.com>, Fries, Dianne
<Dianne.Fries@fultoncountyga.gov>, Lee, Daniel <DLee@sandyspringsga.gov>, aileen.bell.hughes@usdoj.gov
<aileen.bell.hughes@usdoj.gov>, ccarr@law.ga.gov <ccarr@law.ga.gov>, fairhousing@usdoj.gov <fairhousing@usdoj.gov>,
jeremy.monteiro@usdoj.gov <jeremy.monteiro@usdoj.gov>, natara.lee@fultoncountyga.gov
<natara.lee@fultoncountyga.gov>, nigel.lange@oig.ga.gov <nigel.lange@oig.ga.gov>, ryan.buchanan@usdoj.gov
<ryan.buchanan@usdoj.gov>

Ms. Arnold,


If there is a new issue with your unit that was not previously discovered and repaired, you need to advise building management,
allow them to enter the unit to perform an inspection and make it available for them for repair. The photographs you have
included with your email show items that have since been repaired. If there are new items, please advise building management
as I instructed above.


Since moving into your unit, you have never paid rent. The check you initially provided upon move-in was returned by the bank
for insufficient funds. Since that time, you have failed to meet your rent obligations. Rent is not optional and the game you are
playing of making complaints about the unit in an effort to remain in the unit rent free is not acceptable. You have been advised
in the past that the property owner was willing to release you from the lease agreement penalty free and rent free and to make a
sizeable payment towards moving expenses which you refused. You most recently advised me that you intended to move yet
have refused to provide us with the date you intend to vacate the premises.


As you are aware, you called Code Enforcement which has approved the repairs made by your landlord. Moisture readings in
the apartment are normal and there is no evidence of new mold growth during your tenancy. That report is attached.


You continue to include more government officials in your emails. They should be aware of the public records related to your
frivolous lawsuit filings. For instance, in 2016 you sued McDonalds (1:16-CV-2865) related to a 2 for $2 advertisement where
you sought $50,000,000.00 in damages. In 2017 (1:2017-CV-04080) and in 2018 (1:2018-CV-01848), you sued Kroger seeking
over $7,500,000.00 in damages for a hair you alleged to have found on a fish filet. In 2021 (1:2021-CV-01746) you sued Emory
Hospital for $100,000,000.00. All of these suits were dismissed as frivolous. You have threatened to file a similar frivolous
lawsuit against many of the recipients of your email.


In addition, it appears you have been party to a large volume of eviction actions in Georgia.


Last, you are not authorized to make any repairs, improvements or renovations to the apartment. Rather, any requests should
be made to building management as outlined in your lease agreement.


Be governed accordingly.

Sincerely,

Adam C. Joffe, Esq.
GOODMAN MCGUFFEY LLP

Direct: (404) 926-4132

Fax: (404) 264-1737

AJoffe@GM-LLP.com

Licensed in GA

Offices in FL GA SC NC

CONFIDENTIALITY NOTICE: The information contained in this transmittal is legally privileged and confidential information intended only for the use of the individual or entity to which it was intended to be directed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this transmittal is strictly prohibited. If you receive this transmittal in error, please immediately notify us by reply email and delete the original transmittal. Thank you.

[Quoted text hidden]
8-11 after 2.7.2023 4.jpg, invoice_448.pdf, 7699628.PDF

EXHIBIT I

EXHIBIT J

1:31

 

☰





ENJOY THE LIFE
OF LUXURY

CHECK AVAILABILITY

📞 (770) 691-6246

Welcome to Waters Edge

Water's Edge Apartments, a residential apartment

By using this website you agree to our use of cookies as described in our cookie policy.

Got It!

AA    🔒 watersedgeapts.com    ↻

EXHIBIT K

 Gmail

Kimberly Arnold <27.kimberlyarnold30@gmail.com>

## Apt. 8-11

**Nancy Crolley** <ncrolley@liveweller.com>
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>
Cc: David Gates <dgates@liveweller.com>, Eridrick Coleman <manager@watersedgeapts.com>

Thu, Jan 5, 1:49 PM

Hi Kimberly,

I hope all is well and good with you today.

I am happy to hear that you were home and able to personally meet Joe with Peachtree Mitigation yesterday. He informed me about your conversation in addition to showing you that his tools did not register any moisture.

The hot water heater had a leak and was repaired by replacing it. There is no leak and no growing mold.

We want you to be comfortable with your home and are extending three choices.

You mentioned you may be prepared to remain in 811. We are prepared to accommodate this as well as Joe's recommendations for 811.
1. Remove and replace the sheetrock four feet up from the floor in the utility closet.
2. Clean your air ducts
3. Have the maintenance team clean the coils in the furnace.
4. Rent needs to be paid in full as your move-in payment was returned as an NSF, December and January are also due.

Management will also extend the opportunity for you to transfer into 15-05 . This is the ground level apartment that Ed did the FaceTime tour with you. If you choose this option, management will agree to the following.
1. A rent credit of $250 will be granted toward your moving expenses.
2. A rent credit will be extended to pay for the transfer of your utilities. Please provide the receipts for the transfer fees.
3. The above is predicated that rent be paid in 811 and for 15-05 before moving in.

The last option is for management to release you from your contract without penalty for liquidated damages for terminating the contract early and without notice. Rent will still be due for the time you reside in the apartment.

I understand that you may need a couple of days to think about this. Monday will allow 72 + hours to make a decision.

As always, please let us know if you have any questions, concerns or need assistance.

Respectfully,

Nancy

---

**From:** Kimberly Arnold <27.kimberlyarnold30@gmail.com>
**Sent:** Tuesday, January 3, 2023 10:04 AM
**To:** Nancy Crolley <ncrolley@liveweller.com>
**Cc:** David Gates <dgates@liveweller.com>
**Subject:** Apt. 8-11

[ EXTERNAL ]
[Quoted text hidden]

 Gmail

**Kimberly Arnold <27.kimberlyarnold30@gmail.com>**

## Apt. 8-11

**Kimberly Arnold <27.kimberlyarnold30@gmail.com>**                                    Thu, Jan 5, 5:19 PM
To: Nancy Crolley <ncrolley@liveweller.com>
Cc: <jvranich@liveweller.com>
Bcc: <dgates@liveweller.com>, <jemerson@liveweller.com>, <lkrull@liveweller.com>, <moliveri@liveweller.com>

Nancy,

I hope all us well with you as well. I am in receipt of your email. I do understand that your main priority is to protect your business and debunk and claims that I may have. Yes, the hot water heater was replaced, however Joe did mention that there is still moisture in the the utility closet due to the hvac unit being in there also. I have him recorded as I do other conversations with you, Oneighty Solutions and the other mold company that came out to test the air for existing mold spores which were found. So, while his equipment did not detect any moisture, he did not test for EXISTING MOLD SPORES. He did not test the air for existing mold spores, and in order to kill those existing mold spores this entire unit has to be fumigated for at least 30 min. It has been a complete nightmare here and I've tried to make the best of it. The constant headaches, nausea/vomiting, I haven't been able to run my hvac unit during the coldest days of this month due to this mold issue, because the mold company stated that there is a possibility that the mold could be growing inside of the hvac unit due to it being in the same room. Further, the bottom line is that this unit should not have been rented in its condition. By law here in the state of Georgia, every unit has to be in habitable condition and repairs are to be made in a "timely manner" AT THE TIME OF LEASING, it was not in this case, in which people can be held liable both criminally and civilly. This is not the first time that someone has complained of mold with this apartment complex. It's an ongoing issue due to the poor maintenance of this complex on both maintenance's part and management. I have 2 different companies that have both said the same thing. If the apartments are not in living condition, you should not be leasing them. That is called Unjust Enrichment. So, because the apartment was allowed to be leased without proper inspection by management and under deceptive terms and because you waited a month to even start to fix the issue when the issue could have been rectified by Oneighty Solutions earlier, and because you keep trying to justify instead of taking accountability and responsibility, these are your options listed below:

1. 6 months free rent (Nov-May) to remain in my unit with proper repairs; or
2. Be faced with with a multi-million dollar lawsuit for violation of the Americans with Disabilities Act and for renting out a uninhabitable dwelling due to black mold.

Any eviction filings or any other filings will IMMEDIATELY result in a countersuit and/or an initial lawsuit filing for the aforementioned. I look forward in hearing from you by Monday.

Best
[Quoted text hidden]

EXHIBIT L



**ADAM C. JOFFE**
Attorney at Law
Direct Dial: (404) 926-4132
Email: ajoffe@GM-LLP.com
Admitted in GA

ATTORNEYS AT LAW
WWW.GM-LLP.COM

*REPLY TO:*
3340 Peachtree Road NE, Suite 2100
Atlanta, GA 30326-1084

TELEPHONE (404) 264-1500
FACSIMILE (404) 264-1737

January 20, 2023

**VIA EMAIL, US MAIL AND
CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
*CRR# 9314 8699 0430 0103 5547 63*
Kimberly Arnold
8601 Roberts Dr., Unit 8-11
Sandy Springs, GA 30350
*27.kimberlyarnold30@gmail.com*

Re:     Unit 8-11

Dear Ms. Arnold:

We have been retained by Weller in this matter to respond to your complaints about your unit. First and foremost, Weller denies the allegations of your many emails, letters and draft lawsuit. However, Weller is willing to work through your complaints and to make reasonable efforts to resolve any issues related to the condition of Unit 8-11. We understand you have requested to be released from your lease to move from the Waters Edge Apartments.

On January 4, 2023, Peachtree Mitigation inspected Unit 8-11 and found that the unit was dry, there was no active leak and no active mold growth. A copy of Peachtree Mitigation's report is enclosed. Peachtree Mitigation recommended cutting and removing sheetrock 4 feet up from the HVAC closet room to apply antimicrobial to the wall studs and to clean the HVAC coils. As of today's date, that work has been completed. In addition, the following work has been performed on Unit 8-11: the airducts have been cleaned and the flooring has been replaced.

You moved into Unit 8-11 on November 25, 2022 after being shown multiple, alternative apartments at the Waters Edge Apartments. On December 14, 2022, you met with Nancy Crolley and during that meeting, Ms. Crolley offered to move you to a different apartment and if no apartment was suitable to you, you would be let out of your lease, penalty free. She discussed moving to Unit 9-07 with less stairs, but you declined. You also declined the offer to terminate your lease, penalty free, at that time.

Two weeks later, on December 30, 2022, you were shown Unit 15-05 and you agreed to transfer to that unit, but only if you received two months of rent abatement and reimbursement of your moving expenses. Weller agreed to reimburse part of your moving expenses and utility transfer fees.

*A Multi-State Firm with Offices in Georgia, Florida, North Carolina, and South Carolina*
**Atlanta ◆ Savannah ◆ Orlando ◆ Sarasota ◆ Charlotte ◆Raleigh ◆ Columbia ◆ Charleston**

Kimberly Arnold
January 20, 2023
Page 2

On January 5, 2023, Weller again offered to terminate the lease, penalty free. Alternatively, you were provided the option to stay in Unit 8-11 or to transfer, but that you must pay rent. To date, your rent obligations have not been met despite residing in Until 8-11 since November 25, 2022. For instance, your initial rent check paid upon move-in was returned for insufficient funds.

At this time, Weller is willing to release you from your lease agreement and forgo collection of rent during the time you resided within Unit 8-11. In addition, Weller is willing to pay $500 towards your moving expenses. You will be required to vacate the premises no later than February 28, 2023 and to execute a release of all liability.

Be advised, nothing in this letter is intended to modify, amend, alter, waive or release any of the obligations set forth by the controlling lease agreement.

Sincerely,

Adam C. Joffe

ACJ:cas
Enclosures

EXHIBIT M

EXHIBIT N

EXHIBIT O



**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>

## Welcome

**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>
To: <manager@watersedgeapts.com>

Sun, Nov 27, 2022, 1:01 PM

[Quoted text hidden]

EXHIBIT P

EXHIBIT Q

**ONEighty Solutions Inc.**
1353 Riverstone Pkwy., Ste. 120-328
Canton, GA 30114 US
(678) 274-6511
info@oneightysolutions.com
www.oneightysolutions.com



# Receipt

**Received From**

Kimberly Arnold
8601 Roberts Dr
Sandy Springs, GA 30350

**Date:** 12/12/2022
**Payment Method:**
**Reference No:**

| Invoice Number | Invoice Date | Due Date | Original Amount | Balance | Payment |
|---|---|---|---|---|---|
| 14026A | 12/12/2022 | 12/12/2022 | 95.00 | 95.00 | 95.00 |

Memo:

**Amount Credited:** $0.00
**Total:** $95.00

Please mail checks to the address listed above.

----------------------------------------------------------------

No additional transfer fees or taxes apply.
Payment services brought by:
Intuit Payments Inc.
2700 Coast Avenue, Mountain View, CA 94043
Phone number 1-888-536-4801
NMLS #1098819

For more information about Intuit Payments' money transmission licenses, please visit
https://www.intuit.com/legal/licenses/payment-licenses/.

# EXHIBIT R

# EXHIBIT S

EXHIBIT T



LOAD THIS DIRECTION, THIS SIDE UP

MONEY ORDER RECEIPT · NON NEGOTIABLE

AGT 363792 LOC 003188 DT 112522 $449.00 4HUNDRED49DOLLARS AND
NO CENTS

Waters Edge Apartments — Move in

* 2 2 0 0 7 0 1 1 7 0 1 *

LOAD THIS DIRECTION, THIS SIDE UP

EXHIBIT U

EXHIBIT V

 Gmail

**Kimberly Arnold <27.kimberlyarnold30@gmail.com>**

## Your emails

**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>
To: Nancy Crolley <ncrolley@liveweller.com>

Wed, Jan 11, 4:26 PM

Nancy,

Going forward, I would only like to speak directly to either Eridrick, David or any other higher ups. It feels awkward having to communicate with someone that's being deceptive suck as yourself. Just so we're clear, I have picked up on a lot of your tactics and they are as follows:

1. You sent me an email stating " I'm glad you were home" when you know as well as I do that I don't leave this apartment due to the steps as I explained to you when you came by the apartment which is recorded, but the deceptive part is that you did it to try and make it seem like I am able to leave the apartment and go places when I'm not;

2. You sent me another email stating "please do not turn the contractors away as you did before", when in fact the only people that were turned away were the painters due to the fact that I had just got out of the hospital and was dealing with severe headaches and nausea and couldn't handle the fumes, but the deceptive part is that you did it to try to make it seem like the contractors were coming to fix the mold problem.

So, yes I am aware of all of your failed attempts to try to minimize or flat out debunk any claims that I have, so to prevent any type of confusion going forward, I will only be responding to the aforementioned.
[Quoted text hidden]

**EXHIBIT W**

 **Gmail**

## (no subject)
4 messages

**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>                    Wed, Feb 8, 2:50 PM
To: Adam C. Joffe <AJoffe@gm-llp.com>

Please do not have Nancy Crolley come back to my apartment. She's a manipulative and deceptive person and I do not want her back in my apartment at all. I made it very clear to David Gates that I did not want any further dealings with her due to the lying and deception. She showed up here unannounced with the maintenance supervisor and the property manager and recorded in my apartment without my permission. I have been asking these deceptive people to move from this infested apartment and I was ignored. So, I am going to file this lawsuit and find somewhere else to live. I do not want to be harassed. My next step is to call the police. --
~ladykym35~

**Adam C. Joffe** <AJoffe@gm-llp.com>                    Wed, Feb 8, 3:10 PM
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>

Ms. Arnold,

You reported a water leak to me this morning. Nancy and the maintenance staff have a right to enter the apartment to perform maintenance. You advised me you notified them of the condition. Please do not obstruct their ability to do their job.

In regards to your indication below that you intend to leave the apartment, please let me know the date certain that you will vacate the premises so that the apartment staff can plan for your departure. Be advised that you owe rent for the time that you have lived and continue to live in the unit and your failure to pay rent and the other fees for your unit is a violation of your lease which is a contractual obligation.

I understand that no one can control whether you file suit; however, you should also be advised that the suit you have circulated and the claims you intend to make are frivolous, will be in violation of Rule 11 and that we will pursue sanctions to include the cost to defend a frivolous suit.

At this time, let's work together to make sure that your decision to vacate the premises runs smoothly.

Adam C. Joffe, Esq.
GOODMAN MCGUFFEY LLP

Direct: (404) 926-4132

Fax: (404) 264-1737

AJoffe@GM-LLP.com

Licensed in GA

Offices in FL GA SC NC

CONFIDENTIALITY NOTICE: The information contained in this transmittal is legally privileged and confidential information intended only for the use of the individual or entity to which it was intended to be directed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this transmittal is strictly prohibited. If you receive this transmittal in error, please immediately notify us by reply email and delete the original transmittal. Thank you.

[Quoted text hidden]

---

**Kimberly Arnold** <27.kimberlyarnold30@gmail.com>                                     Wed, Feb 8, 3:13 PM
To: Adam C. Joffe <AJoffe@gm-llp.com>

I am not obstructing anyone doing anything. I don't remember Nancy being a maintenance crew member. She came to record my apartment, but now that I know your position I will not reach out to you anymore concerning anymore issues with this raggedy apartment. I will only respond to court correspondence going forward.

Best
[Quoted text hidden]

---

**Adam C. Joffe** <AJoffe@gm-llp.com>                                     Wed, Feb 8, 3:20 PM
To: Kimberly Arnold <27.kimberlyarnold30@gmail.com>

Ms. Arnold,

That isn't my position. Those are the facts.

Please advise when you intend to leave so I can advise Nancy and her staff.

[Quoted text hidden]

EXHIBIT X

EXHIBIT Y

EXHIBIT Z

6600 Sugarloaf Parkway ste 400-393 Duluth ga 30097
4049527774
www.peachtreemitigation.com


PEACHTREE
MITIGATION

# Invoice

| Bill To: | | | |
|---|---|---|---|
| Waters Edge Apartments | | Invoice No: | 373 |
| manager@watersedgeapts.com, ncrolley@liveweller.com | | Date: | 01/04/2023 |
| 8601 Roberts Dr | | Terms: | NET 30 |
| Atlanta, GA, 30350-2215 | | Due Date: | 02/03/2023 |
| (470) 502-9147 | | | |

| Description | Quantity | Rate | Amount |
|---|---|---|---|
| Unit 811 Mircobial assessment<br>Moisture check and visual inspection | 1 | $225.00 | $225.00* |

*Indicates non-taxable item

| | |
|---|---|
| Subtotal | $225.00 |
| Total | $225.00 |
| Paid | $0.00 |

| **Balance Due** | **$225.00** |
|---|---|

Comments

Moisture Count <19% (Dry)
Relative Humidity 55% (normal)

No signs of active leak or visible growth.

Recommendation: Cut and remove sheetrock 4 ft up from HVAC closet room. Apply antimicrobial to interior wall studs and clean HVAC coils.

EXHIBIT A1

Español | Other Languages

 Mold

**CDC** Centers for Disease Control and Prevention



Mold Home

# Basic Facts about Mold and Dampness

## How common is mold in buildings?

Molds are very common in buildings and homes. Mold will grow in places with a lot of moisture, such as around leaks in roofs, windows, or pipes, or where there has been flooding. Mold grows well on paper products, cardboard, ceiling tiles, and wood products. Mold can also grow in dust, paints, wallpaper, insulation, drywall, carpet, fabric, and upholstery.

The most common indoor molds are *Cladosporium, Penicillium*, and *Aspergillus*. We do not have precise information about how often different molds are found in buildings and homes.

## How do molds get in the indoor environment and how do they grow?

Mold is found both indoors and outdoors. Mold can enter your home through open doorways, windows, vents, and heating and air conditioning systems. Mold in the air outside can also attach itself to clothing, shoes, and pets can and be carried indoors. When mold spores drop on places where there is excessive moisture, such as where leakage may have occurred in roofs, pipes, walls, plant pots, or where there has been flooding, they will grow. Many building materials provide suitable nutrients that encourage mold to grow. Wet cellulose materials, including paper and paper products, cardboard, ceiling tiles, wood, and wood products, are particularly conducive for the growth of some molds. Other materials such as dust, paints, wallpaper, insulation materials, drywall, carpet, fabric, and upholstery, commonly support mold growth.

## How do you know if you have a mold problem?

Large mold infestations can usually be seen or smelled.

## How do molds affect people?

Exposure to damp and moldy environments may cause a variety of health effects, or none at all. Some people are sensitive to molds. For these people, exposure to molds can lead to symptoms such as stuffy nose, wheezing, and red or itchy eyes, or skin. Some people, such as those with allergies to molds or with asthma, may have more intense reactions. Severe reactions may occur among workers exposed to large amounts of molds in occupational settings, such as farmers working around moldy hay. Severe reactions may include fever and shortness of breath.

In 2004 the Institute of Medicine (IOM) found there was sufficient evidence to link indoor exposure to mold with upper respiratory tract symptoms, cough, and wheeze in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition.

In 2009, the World Health Organization issued additional guidance, the WHO Guidelines for Indoor Air Quality: Dampness and Mould [PDF – 2.65 MB] {Summary} [PDF – 167 KB]. Other recent studies have suggested a potential link of early mold exposure to development of asthma in some children, particularly among children who may be genetically susceptible to asthma development, and that selected interventions that improve housing conditions can reduce morbidity from asthma and respiratory allergies.

A link between other adverse health effects, such as acute idiopathic pulmonary hemorrhage among infants, memory loss, or lethargy, and molds, including the mold *Stachybotrys chartarum* has not been proven. Further studies are needed to find out what causes acute idiopathic hemorrhage and other adverse health effects.

There is no blood test for mold. Some physicians can do allergy testing for possible allergies to mold, but no clinically proven tests can pinpoint when or where a particular mold exposure took place.

# Who is most at risk for health problems associated with exposure to mold?

People with allergies may be more sensitive to molds. People with immune suppression or underlying lung disease are more susceptible to fungal infections. Individuals with chronic respiratory disease (e.g., chronic obstructive pulmonary disorder, asthma) may experience difficulty breathing. Individuals with immune suppression are at increased risk for infection from molds. If you or your family members have these conditions, a qualified medical clinician should be consulted for diagnosis and treatment.

# How do you keep mold out of buildings and homes?

Inspect buildings for evidence of water damage and visible mold as part of routine building maintenance. Correct conditions causing mold growth (e.g., water leaks, condensation, infiltration, or flooding) to prevent mold growth.

Inside your home you can control mold growth by:

- Controlling humidity levels;
- Promptly fixing leaky roofs, windows, and pipes;
- Thoroughly cleaning and drying after flooding;
- Ventilating shower, laundry, and cooking areas.

## Specific Recommendations:

- Keep humidity levels as low as you can—between 30% and 50%–all day long. An air conditioner or dehumidifier will help you keep the level low. Bear in mind that humidity levels change over the course of a day with changes in the moisture in the air and the air temperature, so you will need to check the humidity levels more than once a day.
- Use an air conditioner or a dehumidifier during humid months.
- Be sure your home has enough ventilation. Use exhaust fans which vent outside your home in the kitchen and bathroom. Make sure your clothes dryer vents outside your home.

- Fix any leaks in your home's roof, walls, or plumbing so mold does not have moisture to grow.
- Consider not using carpet in rooms or areas like bathrooms or basements that may have a lot of moisture.

## How do you get the molds out of buildings, including homes, schools, and places of employment?

Mold growing in homes and buildings indicates that there is a problem with water or moisture. This is the first problem to address.

Remove moldy items from living areas. Once mold starts to grow in carpet, insulation, ceiling tiles, drywall, or wallboard, the only way to deal with the problem is by removal and replacement.

It is important to properly clean and dry the area as you can still have an allergic reaction to parts of the dead mold and mold contamination may recur if there is still a source of moisture.

Remove or replace carpets and upholstery that have been soaked and cannot be dried promptly.

Clean up and dry out your home thoroughly and quickly (within 24-48 hours) after any flooding. Dig out mud and dirt. Use a wet vacuum to remove remaining dirt. Scrub cleanable surfaces (such as wood, tile, stone) with soapy water and a bristle brush. Thoroughly clean all hard surfaces (such as flooring, molding, wood and metal furniture, countertops, and sinks) with water and dish detergent. Dry surfaces quickly and thoroughly after cleaning. If you have a fan, air conditioner or dehumidifier that wasn't affected by flooding use it to help the surfaces dry after you finish cleaning

Mold growth can be removed from hard surfaces with commercial products, soap and water, or a bleach solution of *no more than* 1 cup (8 ounces) of bleach in 1 gallon of water to kill mold on surfaces. Never mix bleach with ammonia or other household cleaners.

If you choose to use bleach to clean up mold:

- Never mix bleach with ammonia or other household cleaners. Mixing bleach with ammonia or other cleaning products will produce dangerous, toxic fumes.
- Open windows and doors to provide fresh air.
- Wear non-porous gloves and protective eye wear.
- Small areas (such as a shower, or an area the size of a door) can often be cleaned by residents, but larger areas might need more professional help. Always follow the manufacturer's instructions when using bleach or any other cleaning product.

If you have an extensive amount of mold and you do not think you can manage the cleanup on your own, you may want to contact a professional who has experience in cleaning mold in buildings and homes.

## Are there any circumstances where people should vacate a home or other building because of mold?

These decisions have to be made individually. If you believe you are ill because of exposure to mold in a building, you should consult your physician to determine the appropriate action to take.

# I found mold growing in my home; how do I test the mold?

If you can see or smell mold, a health risk may be present. You do not need to know the type of mold growing in your home, and CDC does not recommend or perform routine sampling for molds. No matter what type of mold is present, you should remove it. Since the effect of mold on people can vary greatly, either because of the amount or type of mold, you cannot rely on sampling and culturing to know your health risk.

## A qualified environmental lab took samples of the mold in my home and gave me the results. Can CDC interpret these results?

Standards for judging what is an acceptable, tolerable or normal quantity of mold have not been established. Sampling for mold can be expensive, and standards for judging what is and what is not an acceptable quantity of mold have not been set. The best practice is to remove the mold and work to prevent future growth.  If you do decide to pay for environmental sampling for molds, before the work starts, you should ask the consultants who will do the work to establish criteria for interpreting the test results. They should tell you in advance what they will do or what recommendations they will make based on the sampling results. The results of samples taken in your unique situation cannot be interpreted without physical inspection of the contaminated area or without considering the building's characteristics and the factors that led to the present condition.

## I heard about "toxic molds" and "black molds" that grow in homes and other buildings. Should I be concerned about a serious health risk to me and my family?

There is always a little mold everywhere – in the air and on many surfaces.

Certain molds are toxigenic, meaning they can produce toxins (specifically "mycotoxins"). Hazards presented by molds that may produce mycotoxins should be considered the same as other common molds which can grow in your house. Not all fungi produce mycotoxins and even those that do will not do so under all surface or environmental conditions.

Mold growth, which often looks like spots, can be many different colors, and can smell musty.  Color is not an indication of how dangerous a mold may be.  Any mold should be removed and the moisture source that helped it grow should be removed.

There are very few reports that toxigenic molds found inside homes can cause unique or rare health conditions such as pulmonary hemorrhage or memory loss. These case reports are rare, and a causal link between the presence of the toxigenic mold and these conditions has not been proven.
Last Reviewed: November 14, 2022

EXHIBIT A2

March 22, 2023

To:
Adam Joffe;
Weller Management;
Waters Edge Apartments;
Nancy Crolley;
David Gates and all others listed on the complaint:

## Letter of Demand, pursuant to O.C.G.A. 51-12-14

This letter is to inform you of the complaint to be filed in federal court, not only against your client but you as well. You were retained by Weller Management to act as counsel in this legal matter against the aforementioned. Even though we have been in contact about this matter via emails, I need to follow proper legal protocol which requires this letter of demand to be sent via certified or statutory overnight mail.

## VIOLATIONS

On November 25, 2023, your client (Weller Management) placed Kimberly Arnold in a mold infested apartment which was due to an unmaintained, faulty hot water heater leak, and the apartment was left sitting without proper ventilation for months, which is a "Breach of Implied Warranty of Habitability." Management did not fulfill due diligence before placing Kimberly Arnold in that unit, which includes making sure all appliances are working properly, which they were not; ensure that the unit at its entirety is safe and hazardous free, which it was not. Because Landlords must keep all units in livable condition, pursuant to O.C.G.A. § 44-7-13. Mold has been found in several different areas throughout the unit, even though maintenance has fixed some of the areas, others still remain unresolved. Nobody wants to live in mold, nobody should have to live in mold. Further, when Kimberly Arnold hired mold professionals to fix the problem, they were prevented by on site management until corporate was notified and approved, which is unlawful. You yourself Mr. Joffe has even stated via email that Kimberly Arnold was not authorized to make any repairs, adjustments or remodeling to the unit, which is unlawful. Not only does the Georgia Tenant-Landlord handbook give tenants the right to make repairs, but Georgia courts have also recognized "repair and deduct". Further, the Fair Housing Act and American with Disabilities Act gives disabled people the right to make handicap accessible adjustments if necessary and you, Mr. Joffe told me I wasn't authorized, which is unlawful and you being an attorney should have or have had reasonable knowledge of these things. Then, your client advertises luxury apartments while leasing inhabitable units, which violates the Fair Business Practices Act; Uniform Deceptive Trade Practices Act; False Advertising in Statements and other applicable laws. Your client was enriched unjustly and enjoyed that benefit while tenants suffered in mold. There have been several complaints of mold from other tenants and nothing was done until people started reaching out to Sandy Springs Code Enforcement or other governmental agencies. This unit and several other units should have never been leased with active mold. Kimberly Arnold should have never been placed in a unit with steps, after she requested a unit without steps. Kimberly Arnold has reached out to the United States Department of Justice Civil Rights Division to investigate and address the civil rights violations, the investigation is ongoing.

**DAMAGES**

Due to the malicious, deceptive and wanton nature of the violations Kimberly Arnold is asking for damages totaling $50,000,000, also damages for third party beneficiaries.

**RELEASE**

**If an agreement is accepted, all parties will be released from liability and negligence in a court of law. Kimberly Arnold is willing to negotiate.**

Best,

**Kimberly Arnold**
**8601 Roberts Dr**
**Apt 8-11**
**Sandy Springs, GA 30350**
**27.kimberlyarnold30@gmail.com**
**770.966.6437**

EXHIBIT A3



# Inspection Report
# for
# 8601 Robert Drive

December, 2022

# Contents

**Inspection Report**..................................................................................................................... 1

    Site Information ....................................................................................................................... 3

    Background Information ........................................................................................................... 3

    Sampling & Suggested Guidelines ......................................................................................... 3

    How the Report is Organized ................................................................................................. 4

    Lab Analysis Summary Chart................................................................................................. 4

    Sample Results, Outdoor Spore Counts.................................................................................. 4

    Sample Results: Indoor Spore Counts .................................................................................... 5

        Inside....................................................................................................................................... 5

        HVAC Closet Wall .............................................................................................................. 7

    Sample Results: Background Particulate ................................................................................ 7

    HVAC Systems....................................................................................................................... 7

    Interpreting Sample Results.................................................................................................... 8

    Maintaining Indoor Air Quality ............................................................................................. 9

        Filtration: ................................................................................................................................ 9

        Make-up Air: ....................................................................................................................... 10

        Humidity:.............................................................................................................................. 10

        Carpets: ................................................................................................................................. 11

        Pest & Odor Control, Cleaning or Remediation Chemicals: ............................................ 11

        Housekeeping: ...................................................................................................................... 12

    Summary................................................................................................................................. 12

    General Information Concerning Mold .................................................................................. 13

    & Other Particulate ............................................................................................................... 13

    Remediation Guidelines & Safety Precautions..................................................................... 15

    Studies Relevant to Indoor Air Quality ................................................................................ 17

**Attachment: Detailed Lab Report**........................................................................................ 19

**Date of Sample** 12/16/2022   **Date of Report**   12/19/2022
**Name** Kimberly Arnold
**Address** 8601 Robert Drive Apt 8-11
**City** Atlanta  **State** GA  **Zip** 30350
**Phone** 470 642 8724
**Email** 27.KIMBERLYARNOLD30@GMAIL.COM   **JobID** 34682

# Site Information

Property Description: One-story apartment with no basement or crawlspace and brick / siding exterior.

# Background Information

Air Allergen and Mold Testing was asked to perform sampling and make suggestions based on the findings. This written report summarizes the findings and provides general guidelines to prevent the future buildup of spores and other particulate. For additional information regarding the basis of these guidelines, see the attachments to this report.

# Sampling & Suggested Guidelines

Sampling: Spore trap analysis of fungal spores & other airborne particulates by optical microscopy; Microscopic Examination of Fungal Spores, Fungal Structures, Hyphae, and Other Particulate from Tape Lift, Bulk, or Swab.

Suggested guidelines: We currently use the following guidelines condensed from multiple sources when considering the significance of samples taken during an inspection. *Humidity:* Less than 55% at 70 degrees. *Background particulate:* (1) Total particulate count fewer than 100,000 /cubic meter; (2), no insulation or glass-like fibers. *Skin Fragments:* 0-25 % of slide. *Spores:* (1), Spore type and percentage profile similar to outdoor air; (2), Total spore count under 2,500 spores per cubic meter providing that the Aspergillus/Penicillium spores are under 500 spores per cubic meter; (3) No spores requiring wet conditions. *Carpet dust analysis:* (1), Total CFU's/gram under 40,000; (2), minimal spore types found on the EPA's Environmental Relative Moldiness Index (ERMI) list; (3), minimal spores associated with elevated humidity. *Tape Swab Bulk analysis*: No water damage organisms present.

# How the Report is Organized

The following <u>Lab Analysis Summary Chart</u> shows which, if any, findings are above our cited guidelines.  Those findings above our guidelines are shown in red.  The guidelines are not intended to be absolute, but rather give a frame of reference for evaluating the samples.  The farther the results of individual samples are above these guidelines, the more likely health symptoms will occur with the occupants.

Following the summary chart are sections titled <u>Sample Details</u> where each sample is listed separately with details about the lab findings, significance of the findings, inspector's observations, and any suggestions for the area where the samples were taken.

The next section of the report titled <u>Maintaining Indoor Air Quality</u> gives general information about maintaining the indoor air quality.   Following the <u>Summary</u> statements is an explanation of how the guidelines were established in the section titled <u>General Information Concerning Mold</u>.

Following the general information are sections titled <u>Remediation Guidelines and Safety Precautions</u> that provides information about remediation methods and concerns, and <u>Studies Relevant to Indoor Air Quality</u> that support the importance of investigating indoor air quality.  The full <u>Lab Report</u> is attached as a separate PDF.

## Lab Analysis Summary Chart

| Samples Taken | RH | Background Particulate from Air samples | | | | Spores from Air Samples | | | | Carpet Dust | | Tape Swab Bulk |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Suggested Guidelines | Less than 55% at 70 ° F | Total BP Count Below 100,000 | No Insul/ Glass Fiber | Percent Skin 0-25% | Profile Similar to outside | Spore Total Less than 2,500 | High Probability Allergen Spores less than 500 | No Water Damage Spores Present | Total CFU's less than 40,000 | ERMI & Water Damage Less than 10,000 | No Water Damage Organisms Present |
| **Outside** | **64** | **254,347** | **ND** | **83** | **No** | **10,146** | **160** | **ND** | **N/A** | **N/A** | **N/A** |
| Inside | 57 | 116,587 | Yes | 237 | Yes | 2,733 | 893 | ND | N/A | N/A | N/A |
| **HVAC closet wall** | **N/A** | **N/A** | **N/A** | **N/A** | **No** | **N/A** | **N/A** | **N/A** | **N/A** | **N/A** | **Present** |

\* Red = Above Average\* RH = Relative humidity    \*\* = Overloaded \* ND = None Detected

## Sample Results, Outdoor Spore Counts

### *Outside*
*Total Spore Count per Cubic Meter: 10,146*
*High Probability Allergy: 160*
*Hyphal Fragment: 67*
*Skin Fragment: 83*
*Particulate: Carbon, Soil, Talc/Talc Like*

*Fiber: unident Fibers*
*Background: 254,347*
*Humidity: 64 %*
*Temperature: 46 ° F*
*Liters of air sampled: 75*

Comments: Outside samples provide a control to compare the inside samples against. There are mold spores everywhere in the outdoor environment, and the kinds and numbers of spores can vary from day to day and hour to hour. It is normal to expect some of those spores will find their way inside. However, if the inside count exceeds the outside count, or if the kinds of mold found indoors is different than those outside, then it is presumed that the mold spores are being generated inside.

Ninety-four percent of the spores in the outside sample are Basidiospores. Basidiospores are common in the outdoor air but do not normally grow indoors. Therefore, the Basidiospores count can be helpful in comparing the percentages of spores in the indoor samples that come from the outdoors.

Two percent of the spores in this sample are Ascospores. Ascospores are found everywhere in nature.

One percent of the spores in this sample are Cladosporium, which is common in the outdoor air, especially in areas with significant vegetation.

Two percent of the spores are Aspergillus/Penicillium. The lab does not make a distinction between Aspergillus and Penicillium because they are so similar in size and appearance. Information on these and other spores found in the samples is attached at the end of this report.

# Sample Results: Indoor Spore Counts

## Inside
*Total Spore Count per Cubic Meter: 2,733*
*High Probability Allergy: 893*
*Hyphal Fragment: None Detected*
*Skin Fragment: 237*
*Particulate: Carbon, Soil*
*Fiber: unident Fibers, Insulation*
*Background: 116,587*
*Humidity: 57 %*
*Temperature: 60 ° F*

Comments: The total spore count in this air sample is slightly above the cited guideline of less than 2,500 spores per cubic meter.

The count of Aspergillus/Penicillium, considered a high probability allergy spore and often used as an indicator of mold growth in the indoor environment, is above the

cited guideline of less than 500 spores per cubic meter. There are no water damage spores in this sample.

Aspergillus and Penicillium are most often associated with elevated humidity and can be the source of the musty odor associated with mold. Many people are sensitive to these spores as an allergen.

The background particulate is slightly above the cited guideline.

The humidity is slightly above the cited guideline. Mold growth and spore production is significantly retarded when humidity is held near or below fifty percent. Regular use of the HVAC system can be helpful to reduce humidity in the indoor air. However, during periods of the year when the HVAC system is not sufficient to maintain the humidity at this level, consider adding dehumidifiers.

The inspector noted significant suspect microbial growth and water damage to the walls inside the HVAC closet which contains the water heater. There was also water staining on the interior base of the bathroom sink cabinet that appeared to have been painted over.

Make sure all causes of water intrusion or moisture damage are properly repaired before remediation is initiated. For information about remediating drywall or other building materials with visible mold or water damage, please refer to the section of this report titled 'Remediation Guidelines and Safety Precautions'.

Cabinets with minor visible mold or light staining can be cleaned with a mild fungicide. Cabinet surfaces with obvious mold growth or damage should be cleaned, sanded to remove any fungal structures, vacuumed with a HEPA filter vacuum, and sealed with an encapsulant prior to painting. Use of an encapsulant may not be appropriate for surfaces that are to be stained and refinished. Note that some paints contain lead. For that reason, care should be taken to avoid inhaling the dust from sanding.

Cabinets with significant mold or water damage should be removed to allow inspection of the surfaces below and behind. Visible mold or water damage on the floor can be cleaned with a mild fungicide, vacuumed, and treated with an encapsulant. A surface with significant mold or water damage should be replaced, especially if it is plywood that has begun to delaminate. The room is carpeted

The bedrooms are carpeted; however a carpet dust sample was not taken. Air samples provide information about airborne spore counts and background particulate at the time of the inspection while carpet dust analysis gives historical insight into intermittent events that can be helpful in managing the indoor air quality. It is important to note that suggestions made without complete information may result in more or less work than would otherwise be suggested. Please see the notes about carpet in the section titled 'Maintaining Indoor Air Quality'.

For potential health relevance and to compare the results of the samples in this report with similar samples taken from thousands of other properties, please refer to the section of this report titled 'Interpreting Sample Results'.

## HVAC Closet Wall
Type of test: Tape, Swab, or Bulk Sample

A swab sample was taken from a wall inside the HVAC closet and analyzed for mold by optical microscopy. The analysis indicates a greater than 90% presence of Stachybotrys, and a moderate presence of Chaetomium on the tested surface.

Stachybotrys and Chaetomium are indicators of water damage. Exposure to Stachybotrys or "black mold" has been associated with serious respiratory and other health issues. The affected materials should therefore be treated as soon as possible.

# Sample Results: Background Particulate

The background particulate in the inside air sample is above the cited guidelines. Elevated background particulate can result in respiratory discomfort similar to allergy symptoms. Background particulate is removed by the filter in the HVAC system and can be reduced by improved filtration through the use of a higher rated filter and/or by operating the HVAC system fan in the ON position rather than AUTO.

There is at least a trace of insulation or glass-like fibers in the sample from the inside. Insulation in the indoor air can occur as a result of construction work or an entrance to an unfinished area being opened. It is also possible that gaps in seams of the HVAC system allow the introduction of insulation and other airborne particulate into the HVAC system from unfinished areas. In some instances, insulation can result from the breakdown of insulation or duct board inside the HVAC system itself.

# HVAC Systems

An HVAC system is located in the HVAC closet. The inspector reported that the HVAC was accessible for inspection.

The filter in the HVAC system was inadequate for capturing mold spores or respirable particulate. The HVAC system should contain a filter with a minimum of a MERV 10 rating to capture spores and respirable particulate that enter from any source. Make sure that the HVAC system airflow remains adequate and change filters regularly to maximize efficiency.

# Interpreting Sample Results

The following pie charts are provided to compare your results with the results from more than five thousand other properties.



This pie chart shows the total indoor spore counts at other properties divided into four ranges. The median spore count is approximately 2,500 spores per cubic meter, most of which are outdoor spores like Basidiospores or Ascospores. The sample should contain no more than 500 Aspergillus/Penicillium spores per cubic meter.

Outdoor spores that find their way indoors can be reduced by the filter in the HVAC system but require a minimum of a MERV 8 rated filter (or equivalent) for removal.

Elevated Aspergillus/Penicillium spores are an indication of mold growth indoors and can be the source of the musty smell associated with mold. Many people are sensitive to Aspergillus and Penicillium spores as an allergen, particularly the very young whose immune system is not fully developed, an older person whose immune system has grown tired, and those whose immune system is compromised by medication or disease. Some species of Aspergillus/Penicillium produce mycotoxins.



Elevated levels of Aspergillus and Penicillium are most often associated with elevated humidity and it is possible that the Aspergillus/Penicillium spore count will increase with the seasonal increases in humidity.

Cladosporium is the most common spore in HVAC systems and is often found on window and other surfaces affected by condensation. Cladosporium is generally believed to have a low potential to produce mycotoxins, but it can cause allergic reactions. Asthmatics and people who are immune-compromised should be especially wary of elevated levels of Cladosporium.

Water damage spores are associated with serious health concerns. For that reason, even small amounts are noted to encourage identification and elimination of all sources of high moisture or water intrusion.



Carpet dust analysis can give historical insight into intermittent events that can be helpful in managing the indoor air quality.

The Environmental Relative Moldiness Index (ERMI), which indicates whether a home is more or less moldy than average, is based on carpet dust. Studies show that health symptoms increase in homes where the quantity of spores in the carpet are higher than average.

Elevated background particulate can result in respiratory discomfort similar to allergy symptoms. Background particulate is removed by the filter in the HVAC system and can be reduced by improved filtration through the use of a higher rated filter and/or by operating the HVAC system fan in the ON position rather than AUTO. Air Allergen suggests a minimum of a MERV 10 filter to remove background particulate.



# Maintaining Indoor Air Quality

## Filtration:

The way to remove spores, skin fragment, insulation and other particulate that are in the air is through filtration. The HVAC system should contain a filter with a minimum of a MERV 10 rating to capture spores and respirable particulate that enter from any source. While higher rated filters can remove smaller particulate, the increased filtration may reduce airflow, and ultimately reduce filtration efficiency. Make sure that the HVAC system airflow remains adequate and change filters regularly to maximize efficiency.

| Adverse Health Effects from elevated particulate exposure | | | |
|---|---|---|---|
| **Respiratory** | | **Cardiovascular** | **Other** |
| Asthma Exacerbation | Coughing | Heart attacks | Premature death |
| Decreased lung function | Wheezing | Dysrhythmia mortality | Cognitive decline |
| Difficulty breathing | Chest tightness | Heart failure mortality | Reproductive toxicity |
| Pneumonia | Acute lower respiratory disease | Cardiac arrest mortality | Immune dysfunction |
| COPD | Allergy exacerbation | Ischemic Heart Disease Mortality | Endocrine disruption |
| Bronchitis and bronchiolitis | Lung cancer | Stroke | Insulin resistance, Type 2 Diabetes |

If not already doing so, consider operating the fan of the HVAC system on continuous so that filtration occurs even when the thermostat does not call for temperature modification. Alternatively, consider adding air purifiers capable of capturing particulate down to one micron to help remove spores from the air during periods when the HVAC system is not in use.

## Make-up Air:
In addition to mold spores and other particulate, indoor air may contain gasses and chemicals that can become concentrated and affect your health.

| Adverse Health Effects from excessive VOC exposure | | |
|---|---|---|
| **Respiratory** | **Other** | **Neurological** |
| Irritation in eyes, nose, and throat | Cancer | Dizziness |
| Chest tightness | Hypersensitivity | Memory Impairment |
| Wheezing | Headaches | Lightheadedness |
| Asthma exacerbation | Skin irritation | |
| Asthma Induction | Nausea | |
| Pneumonitis | Fatigue | |
| Allergic Rhinitis | Birth defects | |
| Lower airway inflammation | Impaired learning or decision-making skills | |
| Pulmonary Infection | | |
| Bronchial obstruction | Liver toxicity | |

The way gasses and chemical concentrations are reduced in the indoor air is through what is commonly called make-up air.  Make up air is required in large commercial office buildings for the same reason.  A small amount of outside air is introduced into the cold air plenum prior to the filter.  The introduction of the additional air results in the air being gradually turned over reducing the buildup of indo or pollutants.  If your system does not already include make up air, consider asking your HVAC contractor about adding make up air to help manage your indoor air quality.

## Humidity:
Mold growth and spore production is significantly retarded when humidity is held below fifty percent.

| Adverse Health Effects from inadequate humidity Control | | | | |
|---|---|---|---|---|
| **Respiratory** | | **Neurological** | **Other** | |
| Irritation in the eyes, nose, and throat | Acute bronchitis | Short term memory | Hemorrhaging disorders | Seizures |
| Asthma exacerbation | Allergic rhinitis | Executive function/judgement | Altered brain flow | Vitamin B12 deficiency |
| Asthma Induction | Allergic bronchopulmonary mycosis | Attention deficit | Dizziness | Organic Toxic Dust Syndrome |
| Allergy | Hypersensitivity pneumonitis | Hand/eye coordination | Musculoskeletal pain | Gait imbalance |

| Wheezing | Sick Building Syndrome | Depression | Headaches | Numbness and/or tingling |
|---|---|---|---|---|
| Chronic Rhinosinusitis | Shortness of breath | Cognitive deficit | Anxiety | Areflexia |
| Coughing | Bronchopulmonary aspergillosis | Autism Spectrum Disorder | Fatigue | Nausea |
| Chest tightness | | | Carcinogenic, mutagenic, and teratogenic | Sleep Disturbances |
| | | | Skin irritation | Fever |
| | | | Gastrointestinal problems | |

Regular use of the HVAC system can be helpful to reduce humidity in the indoor air. However, if the HVAC system is not sufficient to maintain the humidity below fifty percent, consider adding dehumidifiers.  Dehumidifiers can be arranged to drain automatically so they do not have to be manually emptied. If a drain is not readily accessible, a condensate pump can be attached to the side of the dehumidifier to pump the water to a drain.

## Carpets:
Carpets have been found to be a significant source of spores associated with health complaints.  There are three ways to manage the spore activity in a carpet. The first is regular and thorough vacuuming with a HEPA filter vacuum. The second is cleaning with a carpet safe fungicide and high extraction cleaning machine.  The third is replacement.

If the decision is made to clean a carpet, use a carpet safe fungicide and a high extraction cleaning machine to minimize the moisture left in the carpet.  Make sure the carpet dries quickly and thoroughly, using dehumidifiers if necessary, to prevent the regrowth of mold from any remaining spores due to moisture in the carpet. Consider having a carpet dust sample analyzed after the carpet is cleaned to determine whether the spore count is reduced to acceptable levels or if additional cleaning or replacement is necessary.

When the decision is made to replace the carpet, the floor beneath the removed carpet should be vacuumed, cleaned with a fungicide and treated to encapsulate any remaining spores. If the floor is concrete, consider painting the floor with a moisture barrier to reduce future condensation prior to installing new floor covering.

## Pest & Odor Control, Cleaning or Remediation Chemicals:
Chemicals can cause respiratory and other health symptoms.  If chemicals have been used in the occupied areas, the type and health effects of the chemicals used should be reviewed to determine whether they are contributing to the health concerns of the occupants. Chemicals can generally be removed by cleaning the carpets and wiping hard, non-porous surfaces with a damp cloth coupled with appropriate make up air.

## Housekeeping:

All rugs, carpets and upholstered furniture should be regularly vacuumed with a HEPA filter vacuum to remove remaining spores. A vacuum cleaner without a HEPA filter will merely draw spores and other particulate from the surface and broadcast them throughout the area.

Hard surfaces should be wiped periodically with a mild fungicide, such as now contained in many dusting products, to remove any latent spores before they can find a suitable place to grow.

Note that mold spores can come in when the doors or windows are opened, and can also come in on clothing and shoes. The spore count can also vary as a result of changes in humidity and outdoor spore counts throughout the year. Having a spore free environment is not realistic; filtering the air within the building, regular use of a HEPA filter vacuum cleaner, good house-keeping, and preventing the growth of mold from any spores that do enter by controlling the humidity are keys to maintaining good indoor air quality.

# Summary

The spore counts in the Inside air sample were above the cited guidelines.  The background particulate in the Inside air sample was above the cited guideline, and this sample also contained at least a trace of insulation or glass-like fibers, suggesting the home could benefit from additional filtration.  Analysis of a swab sample taken from the wall inside the HVAC closet indicated a significant presence of Stachybotrys ("black mold") on the tested surface, indicating that the affected materials should be remediated as soon as possible.  The humidity inside the home was slightly above the cited guideline at the time of the inspection.  The above information is offered to help manage the indoor air quality and reduce the future buildup of spores and particulate within the building.

Health symptoms can also be caused by bacterial growth in the shower heads. Consider removing and cleaning the inside of the shower heads with an anti-microbial agent to prevent aerosolizing bacteria from this source.

Note the findings and recommendations in this report are believed to be accurate but are based on the research and guidelines published by others, so we are not able to guarantee the results adequately represent all matters relating to indoor air quality in any one circumstance.

In particular, the above report may not be sufficient to address all indoor environmental factors which may contribute to health symptoms. For this reason, if health issues are a concern, consider consulting with your health care provider about the contents of this report.

We are pleased to have you as a customer. If you have any questions or concerns, please call us at your convenience.

Respectfully,

John Buie
Richard Johnson,
Air Allergen & Mold Testing, Inc.

# General Information Concerning Mold & Other Particulate

It is important to make the distinction between mold and mold spores. Mold is a fungus similar to a plant, while mold spores are similar to the fruit of a plant. When mold is growing, it sends off mold spores to grow more mold, just as plants produce seeds to grow more plants. The spores become airborne and, when inhaled, can cause distress in the respiratory system.

Health symptoms associated with mold spores may include a cough, headaches, asthma and other respiratory discomfort, allergies, sore throat, sinus problems, depression, fatigue, and itchy eyes. The severity of health reactions depends on the type of spore, quantity, growing conditions, and an individual's immune system response. Allergic reactions in airway passages can leave a person more vulnerable to bacteria and viruses.

Some spores contain small amounts of toxins. The concern about toxins varies according to the type of spores, quantity, and growing conditions. When toxins enter the blood stream they can travel to other organs and are believed to be associated with more serious health consequences.

Neither mold nor mold spores smell. The smell normally associated with mold is from the gasses given off when mold metabolizes the materials it is growing on. Therefore, if an odor normally associated with mold is detected, it most likely indicates that mold is growing somewhere nearby. The odor can vary from sweet to pungent, depending on the type of mold, the material it is growing on, and the growing conditions.

Individual reactions to different types and quantities of airborne mold spores vary widely, from inconsequential to life threatening. As a result, national indoor airborne spore count standards have not yet been agreed upon. Nevertheless, numerous government sponsored studies here and abroad over the past thirty years have trended toward similar conclusions about mold in the indoor environment.

Air Allergen has reviewed studies from a number of countries, states, and organizations who published guidelines over the past 30 years including the World Health Organization (WHO), Commission of European Communities (CEC), Finland, Germany, Singapore, Brazil, Czech Republic, Portugal, California, and Texas.

Some studies set a numerical guideline based on spore type. A study funded by the EPA called the Environmental Relative Moldiness Index (ERMI) based its health conclusions on whether the home was more or less moldy than average. Other studies concluded that any mold growth in the indoor environment is inappropriate. Still others conclude that interventions that combine elimination of moisture intrusion and leaks and removal of moldy items help to reduce mold exposure, respiratory symptoms and new onset asthma without addressing quantity or comparison with averages.

In addition to mold spores, the health of occupants can be affected by particles in the air. Particles can consist of dry solid fragments, solid cores with liquid coatings, and/or small droplets of liquid. Particulate exposure has been associated with increased risk of premature deaths, especially in the elderly and people with pre-existing cardiopulmonary disease. Other studies have linked particulate exposure to reduced lung function and respiratory symptoms in children, including the onset of asthma.

The significance and consequences of particulates in the air depends on the quantity, size, shape, and chemical composition. Angular shaped particulate, such as silica, can have an abrasive effect on the body, while other particulate are shaped more like smooth pebbles. Materials like fiberglass are more difficult for the body's systems to break down and eliminate compared to cellulose and cloth, and therefore can be a greater irritant than those easily eliminated by the body's defense system.

Particulate can also include chemicals. One review of studies from 14 states identified 45 potentially toxic chemicals in the indoor air. Ten harmful chemicals were found in ninety percent of the samples including a known cancer-causing agent. The chemicals in second hand smoke are also referred to as particulate in the Surgeon General's report. Exposure to even small amounts of chemicals in combination with other chemicals, bacteria, and mold spores can lead to an amplified health risk.

Particulate are generally divided into three categories based on size; Inhalable, Thoracic, and Respirable. Inhalable means that it can be easily inhaled into the respiratory system. Thoracic particulate can find its way into the small air passages in the lungs. Respirable particulate are particulate that can enter the small air sacs in the lungs where oxygen is exchanged and are defined by the EPA as that particulate having a mid-point size of 4 microns. Respirable particulate includes many chemicals, second hand smoke, and many common mold spores which is the reason that harmful chemicals and toxins associated with mold can enter the blood stream through the lungs.

Given the body of available information Air Allergen currently refers to the following guidelines when considering the significance of samples taken during an inspection. *Humidity:* Less than 55% at 70 degrees. *Spore Trap:* (1), Spore type and percentage profile similar to outdoor air; (2), Total spore count under 2,500 spores per cubic meter, providing that Aspergillus/ Penicillium (high probability allergen) spores are under 500 spores per cubic meter; (3) No spores requiring wet conditions. *Carpet dust*

*analysis:* (1), Total CFU's/gram under 40,000; (2), minimal spore types found on the EPA's Environmental Relative Moldiness Index (ERMI) list; (3), spores associated with elevated humidity less than 10,000 per cubic meter. *Background particulate:* (1) Total particulate count fewer than 100,000/cubic meter; (2), no insulation or glass-like fibers. *Skin Fragments:* 0-25 % of slide.

It should be noted that these guidelines are to be considered in the context of the inspection, indicating where steps can be taken to improve the environment and its effect on the health of the occupants. The farther the results of individual samples are from these guidelines, the more likely health symptoms will occur with the occupants.

## Remediation Guidelines & Safety Precautions

All remediation generally follows these steps, the degree of which may vary depending on the level of contamination.

- Identify and eliminate any sources of water intrusion or high humidity.
- Prevent the spread of mold spores with containment when appropriate.
- Remove materials that cannot be cleaned.
- Kill the mold with a fungicide.  Capture spores in the air with filtration.
- Remove remaining spores on hard surfaces by wiping.
- Remove remaining spores on porous surfaces, such as drywall or wood framing, by vacuuming, exhausting the vacuum outside.
- Seal any remaining spores on porous materials with an encapsulant.
- Vacuum, clean or replace rugs, furniture, or carpeting.
- Use personal protection appropriate to the level of contamination.
- Use people safe fungicides and encapsulants.

Goggles and a mask with an N95 rating should be worn when working around mold spores. Note that the mask will not protect the wearer from the effects of any chemicals used in the remediation process.

According to the EPA, mold contamination of less than ten square feet can be handled as normal maintenance.  For contaminated areas between ten and one hundred square feet, plastic sheeting should be used to minimize air flow to other areas during remediation. For mold contamination in excess of one hundred square feet, additional containment and personal protection is recommended.  You can find information regarding protection, containment and other issues at http://www.epa.gov/iaq/molds/table2.htm.

Though chlorine and water is commonly used as a fungicide to clean mold, it is not suggested for cleaning porous materials such as drywall, wooden joists or studs. Chlorine kills mold, but does not do well in killing spores. Chlorine evaporates faster than the water and the water left behind can provide moisture for the remaining spores to begin to grow. Chlorine is a strong oxidizer and can adversely affect the lungs of people exposed to the fumes.

Chemicals used during remediation such as fungicides, encapsulators, and moisture barriers should be investigated to assure that the residue or off-gassing of the material will not cause respiratory distress in the occupants. Consider contacting your Home Improvement or Janitorial Supply Store for recommendations as to products and their use.

Supply or return HVAC vents that service the area being remediated should be taped over during remediation to prevent contaminating other areas of the building. When remediating attics, basements, and crawlspaces that contain HVAC systems or ductwork, all seams in the HVAC system should be taped and any gaps where sheet metal spans joists as a cold air return or where the ductwork enters occupied areas of the building should be sealed to prevent air from the unoccupied areas from entering the occupied areas.

When using containment, a negative pressure should be created in the area being remediated when compared to the rest of the building. This will cause airflow from uncontaminated areas to go in the direction of the area being remediated to limit contamination in the rest of the building.

Although exhausting air scrubbers to the outside to create negative pressure is applicable in some circumstances, air scrubbers exhausted outside can draw air from wall cavities and other places that can further contaminate the work area. Instead of exhausting a large air scrubber outside, consider placing a low speed box type fan directed outward through a window in the area being remediated that draws air from uncontaminated area to replace the exhausted air. Make especially sure that access to crawlspaces, attics and unfinished basements outside of the work area are sealed to prevent air in areas not served by the HVAC system from being drawn into the work area.

Make sure all causes of water intrusion or moisture damage are properly repaired before remediation is initiated. Porous materials, such as drywall, wood studs, plates, wood floors and other plywood surfaces should be encapsulated after cleaning and prior to reconstruction to provide protection against remaining embedded spores beginning to grow when conditions are favorable.

Drywall or other materials with a light dusting of mold can be wiped with a mild fungicide and vacuumed with a HEPA filter vacuum.  Drywall or other materials with obvious visible mold should be cleaned with a fungicide, lightly sanded, vacuumed with a HEPA filter vacuum, and sealed with an encapsulant.

Drywall or other materials with significant mold or water damage as a result of being wetted from the opposite side or flooded should be removed to a point approximately two feet beyond any visible mold or water damage. Insulation that has been wetted or is adjacent to wetted and damaged building materials should also be removed. Baseboards and other trim can be removed to inspect behind the removed trim for mold and water damage.

If removing drywall or other materials from ceilings, walls or floors exposes the area being remediated to another area, both areas should be remediated or provisions should be made to prevent air from the un-remediated area to flow toward the area being remediated.

Surfaces behind any removed materials, such as the backside of an opposite wall, wall studs, base plates, sub-flooring and joists, should also be wiped with a mild fungicide and vacuumed with a HEPA filter vacuum, exhausting the vacuum to the outside air. Surfaces with obvious visible mold or that are slightly damaged should be vacuumed, lightly sanded, cleaned with a fungicide and treated with an encapsulant. A surface with significant mold or mold damage should be replaced.

For vacuuming spores and other particulate from the work surface, use a vacuum cleaner with a HEPA filter. A vacuum cleaner without a HEPA filter will not capture mold spores and respirable particulate. Even with a HEPA filter, consider exhausting the vacuum outside of the building so that any spores that do make it through the filter are not reintroduced into the remediated area or disturb other spores until they have been vacuumed. HEPA filters and exhaust extensions for shop type vacuums are available through janitorial supply stores as well as many home improvement stores.

After treatment and encapsulation, operate the air scrubber for twenty-four to forty-eight hours with the windows closed to remove any remaining spores.  Air scrubbers should be turned off at least twenty-fours prior to taking clearance samples.

## Studies Relevant to Indoor Air Quality

Concentrating on the indoor environments is particularly important for children, since they can spend as much as 90% of their time indoors.  Exposure to indoor air pollutants can cause health effects ranging from sneezing and coughing to exacerbations of chronic respiratory disorders such as asthma. *American Thoracic Society May 2010*

Three recent, high quality, systematic reviews of the available evidence concluded that the implementation of interventions that combine elimination of moisture intrusion and leaks and removal of moldy items help to reduce mold exposure, respiratory symptoms and new onset asthma.  This position has also been taken by the National Institute for Occupational safety and Health (NIOSH), many State governments, Health Canada, and internationally by the World Health Organization. *Position Statement on Mold and Dampness in the Built Environment by the American Industrial Hygiene Association March 26 2013*

More than 50 epidemiological studies have been performed in different parts of the world. The majority of the studies have found adverse health effects from particulate matter at levels lower than the current federal standard. Particulate air pollution has been associated with increased respiratory illness or chronic respiratory symptoms, asthma aggravation, increased hospital admissions, and premature deaths. *The American Lung Association.*

Researchers pooled data from 26 peer-reviewed papers and one unpublished dataset that analyzed dust samples taken from homes in 14 states. They found 45 potentially toxic chemicals that are used in many consumer and household products. Ten harmful chemicals were found in ninety percent of the samples including a known cancer-causing agent called TDCIPP. Exposure to even small amounts of chemicals in combination can lead to an amplified health risk, especially for developing infants or young children. *Milken Institute School of Public Health (Milken Institute SPH) at the George Washington University 2017.*

Inexpensive, low-efficiency HVAC filters offer no better particle removal than no filter. *Effectiveness of Air Filters and Air Cleaners in allergic Respiratory Diseases: A review of the Recent Literature by James L. Sublett, National Center for Biological Information July 2011*

Dampness and mold in homes is associated with increases in several adverse health effects including upper respiratory symptoms, cough, wheeze and asthma exacerbation. *Indoor Air Quality Scientific Findings Resource Bank by the Indoor Environment Group of the Lawrence Berkeley National Laboratory with funding support from the U.S. Environmental Protection Agency.*

Children living in a high ERMI value home at 1 year of age had more than twice the risk of developing asthma by age 7. *Annuals of Allergy, Asthma, & Immunology July, 2012*

Housing dilapidation, especially the damage caused by water leaks, is directly linked to the rates of poorly controlled asthma in inner city children. Remediating water damaged buildings has improved the control of childhood asthma. After remediation, emergency room visits and hospitalizations were reduced from 22 visits and 11 admissions to 2 visits and one admission. A reduction in the dosage of medications was possible in all patients and, in some cases, certain medications were taken off following the intervention. *Journal of Asthma 2012*

Bedrooms with higher levels of particles were linked to more symptoms in the children with asthma. As the concentration of coarse particles got higher, the symptoms increased. Symptoms included coughing, wheezing and chest tightness. This study suggests that finding ways to cut down on the particulate matter in the air may help to reduce the symptoms of children with asthma. *Meredith C. McCormack, MD, MHS, an instructor with Johns Hopkins School of Medicine and researchers from the Center for Childhood Asthma in the Urban Environment, which is a joint center of Johns Hopkins School of Medicine and John Hopkins Bloomberg School of Public Health. August 2009*

Forced air systems with high efficiency filtration were found to provide the best control of asthma triggers: 30-55% lower cat allergen levels, 90-99% lower risk of respiratory infection through the inhalation route of exposure, 90-98% lower environmental tobacco smoke (ETS) levels, and 50-75% lower fungal spore levels than natural ventilation, portable air cleaners and forced air ventilation equipped with conventional filters. *Environmental Health, August 2008*

A study of the mortality-related benefits and costs for improvements in particle filtration in US homes and commercial buildings done at the Lawrence Berkeley National Laboratory determined that improved particulate filtration resulted in reduced mortality rates and economic benefits always exceed costs with benefit-to-cost ratios ranging from approximately 3.9 to 133. *Lawrence Berkeley National Laboratory, March 2017.*

# Attachment: Detailed Lab Report

Z:\AirAllergen\Customers\202212_34682_Arnol8601_\Air Allergen Mold Testing Report at 8601 Robert Drive for Kimberly Arnold December 2022.docx

**Company:**

**Attention:** Kimberly Arnold

**Address:** 8601 Robert Drive, Atlanta, GA 30350

**Project:** 8601 Robert Drive Apt 8-11

**Air Allergen Mold Testing, Inc.**

1543 Lilburn Stone-Mountain Road. Suite 200
Stone Mountain. GA 30087
Phone  (770) 938-4861  Fax  (678) 723-5848

Linear Spore Trap Analysis by SOP LAB-SOP-SPT-001

**Report Date** 12/19/2022
**Date Received** 12/16/2022
**Analyzed by** S. SporeCyte
**Date Ammended**
**Report Number** 34682

| Location | Outside | | | Inside | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| AAMT Nbr | 34682-001 | | | 34682-002 | | | | | |
| Spore Trap Serial # | 02493955 | | | 02502521 | | | | | |
| Sample/Cassette Type | Allergenco D Posi-Track | | | Allergenco D Posi-Track | | | | | |
| Liters Collected | 75 L | | | 75 L | | | | | |
| Humid/Temp | 64 / 46 | | | 57 / 60 | | | | | |
| Particulate | Carbon Talc/Talc Like | | Soil | Carbon | | Soil | | | |
| Fibrous Particulate | unident Fibers | | | unident Fibers | | Insulation | | | |
| Skin Fragments | 83 | | | 237 | | | | | |
| Background / Cubic Meter | 254,347 | | | 116,587 | | | | | |
| Hyphae / m ³ | 67 | | | | | | | | |
| Pollen / m ³ | | | | | | | | | |
| Spore Name | Raw Ct | Spore / m ³ | % of Total | Raw Ct | Spore / m ³ | % of Total | Raw Ct | Spore / m ³ | %Total |
| Predominately Outdoor | | | | | | | | | |
| Alternaria | 1 | 13 | 0.1 | | | | | | |
| Arthrinium | | | | | | | | | |
| Ascospores | 14 | 187 | 1.8 | | | | | | |
| Basidiospores | 717 | 9,560 | 94.2 | 133 | 1,773 | 64.9 | | | |
| Bipolaris | | | | | | | | | |
| Curvularia | | | | | | | | | |
| Epicoccum | | | | | | | | | |
| Nigrospora | | | | | | | | | |
| Periconia/Myxomycete | | | | | | | | | |
| Pithomyces | 1 | 13 | 0.1 | | | | | | |
| Spegazzinia | | | | | | | | | |
| Torula | | | | | | | | | |
| Misc | 9 | 120 | 1.2 | 3 | 40 | 1.5 | | | |
| Indoor - Outdoor | | | | | | | | | |
| Aspergillus/Penicillium | 12 | 160 | 1.6 | 67 | 893 | 32.7 | | | |
| Cladosporium | 7 | 93 | 0.9 | 2 | 27 | 1.0 | | | |
| Water Related | | | | | | | | | |
| Chaetomium | | | | | | | | | |
| Stachybotrys | | | | | | | | | |
| Trichoderma | | | | | | | | | |
| Total Spores | 761 | 10,146 | 100 | 205 | 2,733 | 100 | | | |

Limit of Detection @600x     44     44
Limit of Detection @300x     13     13

Please see attached sheet for additional information and important notes.

**Top 3 organisms =**          Richard Johnson, Laboratory Director
The uncertainty of measurement associated with the measurement results contained in the report is available upon request.

AIHA Culture Proficiency Analytical Testing Participant # 199873  PJLA ISO/IEC 17025:2017 Environmental Accreditation # 91033          LAB-FRM-ITS-00

**Company:**

**Attention:** Kimberly Arnold

**Address:** 8601 Robert Drive, Atlanta, GA 30350

**Project:** 8601 Robert Drive Apt 8-11

**Air Allergen Mold Testing, Inc.**

1543 Lilburn Stone-Mountain Road, Suite 200
Stone Mountain, GA 30087

Phone   (770) 938-4861   Fax   (678) 723-5848

Linear Spore Trap Analysis by SOP LAB-SOP-SPT-002

**Report Date** 12/19/2022

**Date Received** 12/16/2022

**Analyzed by** S. SporeCyte

**Date Amended**

**Report Number** 34682

**Spore Trap Comments**

---

The uncertainty of measurement associated with the measurement results contained in the report is available upon request.

Background is a combination of **debris, skin** and fibers.

\* Water Related refers to organisms that are commonly found in areas of high water activity. This can be in the form of high Relative Humidity (RH), meaning consistently above 50%.

\*\*Spore Total symbols are; ND is None Detected, DS is Defective Slide and NT is No Trace

Richard Johnson, Laboratory Director

LAB-FRM-ITS-003

AIHA Culture Proficiency Analytical Testing Participant # 199873   PJLA ISO/IEC 17025:2017 Environmental Accreditation # 91033

**Company:**

**Attention:** Kimberly Arnold

**Address:** 8601 Robert Drive Atlanta, GA
30350

**Project** 8601 Robert Drive Apt 8-11

**Air Allergen Mold Testing, Inc.**

1543 Lilburn Stone-Mountain Road. Suite 200
Stone Mountain. GA 30087
Phone   (770) 938-4861   Fax   (678) 723-5848

Report Number  34682

**Report Date** 12/19/2022

**Date Received** 12/16/2022

**Analyzed by** S. SporeCyte

**Job Number** 34682

**DateAmended**

**Direct Exam Microscopic Analysis**
**bv SOP LAB-SOP-DIR-001**

| Location | HVAC closet wall | | Location | | |
|---|---|---|---|---|---|
| AAMT  Nbr | 34682-003 | | AAMT  Nbr | | |
| Sample ID | SW-01 | | Sample ID | | |
| SampleType | Swab | | SampleType | | |
| Background 1 | Dust | | Background 1 | | |
| Humidity/Temp | / | | Humidity/Temp | | |
| Dustmites | Absent | | Dustmites | | |
| Hyphae | Moderate | | Hyphae | | |
| **Spore Type** | **Amount** | **FS** | **Spore Type** | **Amount** | **FS** |
| Stachybotrys | > 90 % | ☐ | | | ☐ |
| Chaetomium | Moderate | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |
| | | ☐ | | | ☐ |

The uncertainty of measurement associated with the measurement results contained in the report is available upon request.

Qualitative analysis
Predominant = major spore type on slide.  More than one spore type can be
Predominant.
*Moderate = < 50% of slide.*
Rare = < 10% of slide.
FS = Fruiting structures present.  Indicates fungi is currently growing.

Richard Johnson, Laboratory Director

LAB-FRM-ITS-004

AIHA Culture Proficiency Analytical Testing Participant # 199873   PJLA ISO/IEC 17025:2005 Environmental Accreditation # 91033



## How To Read Our Reports

| | |
|---|---|
| Volume (L) | 75 |

Amount of air sampled out of 1000 liters

| | |
|---|---|
| Particulate | soil |
| Fibrous Particulate | insulation |
| Skin Fragments % | 26-50 |
| Background / m³ | 126,853 |

Total particles in 1 cubic meter of air
*(1000 liters)*

| | |
|---|---|
| Hyphae / m³ | 1067 |

| Spore Name | Raw Count | Spores/m³ | % Total |
|---|---|---|---|
| Alternaria | 2 | 83 | 0.4 |
| Arthrinium | | | |
| Arthrospores | | | |
| Ascospores | | | |
| Basidiospores | | | |
| Bipolaris | | | |
| Curvularia | | | |
| Epicoccum | | | |
| Nigrospora | 5 | 207 | 0.9 |
| Periconia/Myxomycete | | | |
| Pithomyces | | | |
| Spegazzinia | | | |
| Tetraploa | | | |
| Torula | | | |
| Urediniospores | | | |
| Aspergillus/Penicillium | 400 | 16,593 | 73.1 |
| Cladosporium | 127 | 5,268 | 23.2 |
| Chaetomium | 10 | 415 | 1.8 |
| Stachybotrys | 3 | 124 | 0.5 |
| Trichoderma | | | |
| Ulocladium | | | |
| **Total** | 547 | 22,690 | 100 |

Predominantly Outside

Inside / Outside

Water Related

How many spores the analyst counted (raw count)

Percent of the total spores present per cubic meter

Total number of spores after formula applied to raw spores count, which will equal how many spores there are per 1 cubic meter of air

Total spores in this sample per 1 cubic meter of air.

Please see attached sheet for additional information and important notes.

Limit of Detection @ 600x    44

Limit of Detection @ 300x    13

Each spore counted by the analyst represents this many spores at 1 cubic meter, at the specified magnification

## How to Read Our Reports

The major groups of spores are separated into                                ,

| Predominantly Outside | Inside / Outside | Water Related |

This is to make it easier to compare important groupings on the report.

1. The spore types, as well as the number identified is important.  High levels of *Aspergillus /
   Penicillium,* and any level of the Water Related organisms should be of concern.

2. The **Outside** sample is used to verify that the sampling equipment is operating correctly.  The
   Outside sample can also be used to determine if the HVAC is operating properly and as a
   comparison to the spores recovered inside.

3. The **Background** is represented as particles per cubic meter.  The higher the number of particles
   the more likely that the HVAC is not operating correctly, or there may be overcrowding in the
   room.  High levels of particles can also be an indicator of poor air quality that can lead to
   respiratory irritation.

4. **Skin fragments** are common in the indoor air.  As the % of fragments rise, the more chance that
   it *may be indicating poor circulation or overcrowding.*

5. **Particles and Fibers**  If there is something important to note or if dust mite parts are observed, it
   will be noted on the SPORE TRAP COMMENTS page. Only major categories are listed.

6. **Hyphae** are analogous to the stem of a plant. The spores arise from the hyphae, therefore,
   hyphae should be taken into account when looking at the total spore count, although they are not
   a part of that number.  Hyphae can also give rise to new fungus growth

7. The **spore types** are explained in the Organism section of the report.

8. The **Limit of Detection** is equal to one spore counted by the analyst divided by the inverse of the
   volume sampled and by the percent of the slide analyzed.  If the detection limit is 44, it means that
   every spore in the raw count equals 44 spores of that type in 1 cubic meter of air for 75 liters of air
   collected, with an analysis of 30% of the slide at 600x (magnification).

9. Not all spores can be definitively categorized due to the similarity in morphologies. Spores are
   classified according to the closest scientific description available.

## FUNGAL ORGANISM DESCRIPTIONS

| Organism | | Recovered From | Comments | Inside / Outside Spore Type | High Water Activity Indicator | Mycotoxins Produced | Health Risk Type | Found in Combination with |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | | | | | |
| Acremonium | species | soil, dead leaves, carpet, gypsum board | generally recovered in large numbers | Often recovered from water damaged inside wall board and carpeting | YES | NO | keratitis, mycetoma, aspergillosis | Stachybotrys, Chaetomium, Trichoderma, Aspergillus, Penicillium |
| Alternaria Alternaria | alternata sp. | carpet and air. Mostly an outside spore on plants and in soil | occurs in small amounts | OUT | YES | YES | phaeohypho-mycosis, infections of bone, cutaneous tissue, ears, eyes, paranasal sinuses and urinary tract | Bipolaris, Curvularia, Cladosporium, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Arthrinium | species | soil, forest litter, plant materials, decaying wood, decaying wood in crawl spaces | not often occuring inside, generally outside in moderate numbers. Often found on decaying wood in crawl spaces | OUT | | NO | NA | Curvularia, Bipolaris, Cladosporium, Pithomyces, Epicoccum |
| Ascospores | | wide variety of substrates. Plant, soil, air, cellulose materials, wood in crawl spaces | at certain times of year, found in large numbers outside | OUT | Chaetomium globosum, Eurotium species - YES. Most other genera and species, NO | dependent on genus or species recovered | Not generally involved with human disease. | Basidiospores (if outside), not generally recovered on laboratory media. |
| Aspergillus | flavus | common in seeds, nuts and cereals | | BOTH | YES | YES | Respiratory pathogen. Second most often cause of aspergillosis and/or invasive aspergillosis | Aspergillus sp, Penicillium sp. |
| Aspergillus (Neosartorya) | fumigatus (fischeri) | Air, Carpet, HVAC | Must be < 1. Not tolerated at any level inside. | NA | NA | YES | Respiratory pathogen. Most often cause of aspergillosis and/or invasive aspergillosis | Aspergillus versicolor, Aspergillus sydowii, Aspergillus niger, Penicillium sp., Cladosporium sp., bacteria |
| Aspergillus | brasiliensis / niger | food, indoor air | | BOTH | YES | YES | aspergillosis | other Aspergillus, Penicillium |
| Aspergillus | ochreceus | coffee beans, spices, soil | | BOTH | YES | YES | aspergillosis | Aspergillus versicolor, Aspergillus sydowii, Aspergillus niger, Penicillium sp., Cladosporium sp., bacteria |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 1 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 6 of 14

| Organism Genus | Species | Recovered From | Comments | Inside / Outside Spore Type | High Water Activity Indicator | Mycotoxins Produced | Health Risk Type | Found in Combination with |
|---|---|---|---|---|---|---|---|---|
| *Aspergillus* | *species* | soil, food, air, carpet, HVAC | Large amounts when recovered | BOTH | YES several species | YES several species | aspergillosis, allergy | *Penicillium* |
| *Aspergillus* | *sydowii* | soil, food, leather | | BOTH | YES | NO | aspergillosis | other *Aspergillus, Penicillium* |
| *Aspergillus* | *ustus* | food, indoor environment | | BOTH | YES | NO | aspergillosis | other *Aspergillus, Penicillium* |
| *Aspergillus* | *versicolor* | HVAC, insulation, carpet, air | Must be < 1.  Not tolerated at any level inside. | NA | NA | YES | aspergillosis | *Aspergillus sydowii, Aspergillus fumigatus, Aspergillus ususts* |
| *Aureobasidium* | *pullulans* | food, indoor, soil, leaf, seeds, fruit drinks, carpet, wet areas | | INSIDE | YES | NO | corneal, peritoneal, cutaneous, pulmonary, systemic mycosis | yeasts, *Chaetomium, Stachybotrys, Trichoderma, Aspergillus, Penicillium* |
| *Basidiospores* | | soil, wood, cellulose materials, plywood when wet  related to "wood rot" | large amounts | OUTSIDE | YES | NO for air, YES for some mushrooms | NONE from air.         Some mushrooms ingested can contain dangerous toxins | Ascospores, recovered on laboatory media as sterile mycelium, sometimes with "clamps" and/or arthrospores |
| *Bispora* | *sp.* | soil, wood | | OUTSIDE | NO | NO | NA | *Bipolaris, Curvularia, Cladosporium, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium* |
| *Chrysonilia* | *Species* | soil | also known as *Neurospora* | BOTH | NO | NO | NA | NA |
| *Chaetomium Chaetomium* | *species globosum* | Ascospore commonly associated with wet gypsum board.   Present in soil | Large amounts when recovered | INSIDE | YES | NO | occasionally associated with infections of blood, brain, skin and nails | yeasts,  *Stachyboutrys, Trichoderma, Aspergillus, Penicillium* |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 2 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 7 of 14

| Organism Genus | Species | Recovered From | Comments | Inside / Outside Spore Type | High Water Activity Indicator | Mycotoxins Produced | Health Risk Type | Found in Combination with |
|---|---|---|---|---|---|---|---|---|
| Cladosporium | cladosporioides | plant material, soil, indoor air, carpet, HVAC | common spore in the indoor air. Indicates normal air when greater than C. sphaerospermum | BOTH | NO | NO | NA | Alternaria, Curvualria, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Cladosporium | sphaerospermum | plant material, soil, indoor air, carpet, HVAC | high amount in indoor air indicates poor air quality | BOTH | YES | NO | NA | Cladosporium cladosporioides, Aspergillus sp., Penicillium sp. |
| Cladosporium | species | plant material, soil, indoor air, carpet, HVAC | | BOTH | NO | NO | NA | Alternaria, Curvualria, Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Curvularia | species | soil, plant material, carpet, cellulose materials (paper) | | BOTH | | | opportunisitc pathogen of cornea and sinuses.  Related to keratitis, endocarditis, mycetoma and pulmonary infection. | Alternaria, Cladosporium species Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Dicyma | species | soil | related to wood rot | OUT | YES | NO | NA | Chaetomium, Stachybotrys, Trichoderma |
| Epicooum | nigrum | plants, soil, carpet, air, seeds | generally recovered in small numbers | primarily outside but is common inside, as well. | NO | NO | None | Alternaria, Curvualria, Cladosporium spcies, Pithomyces, Drechslera, Exserohilum, Helminthosporium |
| Eurotium Eurotium | amstelodami herbariorum | soil, variety of food, indoor air | | BOTH | NO Although, Xerophillic, often found in water damaged buildings. | NO | aspergillosis | Aspergillus, Penicillium |
| Fusarium | species | grains, soils, apples, potatoes, sugar beet, maize | few, when recovered | BOTH | NO | YES several species | keratitis, occasionally mycetoma, sinusitis, septic arthritis and onychomycosis.  Contains highly toxic secondary metabolites when ingested in some food grains. | Aspergillus, Penicillium, Acremonium, Epicoccum |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

AAMT
control # R101
Rev. 0
3/10/2010

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found in |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Microsporcum | species | human and animal scalp, skin, nails | rarely recovered in air samples | IN | NO | NO | dermatophyte.  Ringworm, infections of skin, scalp and nails | Trichopyton, Epidermophyton |
| Mucor | species | soil, wet damp materials | common bread mold | BOTH | YES | NO | Common cause of zygomycosis | Rhizopus, Absidia, Cunninghamella, Syncephalastrum |
| Myxomycete | | plant pathogen | low, outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Nigrospora | species | carpet, air, soil, plants | | BOTH | NO | NO | None | Alternaria,Cladosporium species Pithomyces, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Paecilomyces | variotii | soil, compost | thermophillic | Both | YES | YES | sinusitis, eye infections | Aspergillus, Penicillium |
| Penicillium | sp. | soil, food | most common spore type found in the indoor air | Both | YES | YES several species of the approximately 200 known | Aspergillosis | Aspergillus, Paecilomyces |
| Periconia | species | plant pathogen | low, outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Phoma | species | plant, soil, caroet, wood | | BOTH | NO | NO | occsional agent of phaeohyphomycosis | found in combination with a variety of wood rot or plant pathogen fungi |
| Pithomyces | species | soil, air, plant material | at certain times of the year can be recovered in moderate amounts from | OUTSIDE | NO | NO | NONE | Alternaria,Cladosporium species, Epicoccum, Drechslera, Exserohilum, Helminthosporium |
| Rhizopus | species | soil, damp wet materials | common bread mold | BOTH | YES | NO | Most  common cause of zygomycosis | Mucor, Absidia, Cunninghamella, Syncephalastrum |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga  30087

Page 4 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 9 of 14

| Organism Genus | Species | Recovered From | Comments | Inside / Outside Spore Type | High Water Activity Indicator | Mycotoxins Produced | Health Risk Type | Found in Combination with |
|---|---|---|---|---|---|---|---|---|
| Rhodotorula | species | wood, behind wall paper, cellulose products, carpets | pink, orange or red yeast, needs very high water activity levels | BOTH | YES | NO | NONE | Sporobolomyces, Aureobasidium, Chaetomium, Stachybotrys |
| Scopulariopsis | brevicaulis | soil, wood, food | has a characteristic ammoniacal odor | BOTH | NO | NO | Can infect toenail. May be a risk or subcutaneous or invasive infections of the immunocompromised | Aspergillus, Penicillium |
| Spegazzinia | species | soil, plants | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Sporothrix | species | soil, wood, moss | | BOTH | | | one species is known to cause human infections | |
| Stachybotrys Stachybotrys | chartarum echinata | Most often actively growing on the backside of gypsum board. Carpet, HVAC provide sparse growth and sometimes only spores | Must be < 1. Not tolerated at any level inside, although individual spores are occasionally brought in on shoes from the soil. | Most often recovered inside | YES | YES | Neurotoxic. Toxins are damaging to organs but the spores do not grow at body temperature. | Chaetomium, Trichoderma, Acremonium, Ulocladium, Aspergillus usuts |
| Stemphylium | species | soil, grass, wood, paper | in small numbers outside | OUTSIDE | NO | NO | NONE | Alternaria, Cladosporium species, Epicoccum, Drechslera, Exserohilum, Helminthosporium, Curvularia, Pithomyces, Bipolaris |
| Tetraploa | species | plant material | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Torula | species | soil, plants | very small numbers outside | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 5 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 10 of 14

| Organism | | Recovered From | Comments | Inside / Outside | High Water Activity | Mycotoxins | Health Risk | Found In |
|---|---|---|---|---|---|---|---|---|
| Genus | Species | | | Spore Type | Indicator | Produced | Type | Combination with |
| Trichoderma | species | soil, plant material, carpet, cellulose materials (paper), decaying wood | clumps of green spores in large numbers | BOTH | YES | NO | T. viride is associated with aspergillosis. T. harzianum is associated with hypersensitivity pneumonitis | Aspergillus, Penicillium, Chaetomium, Acremonium, Stachybotrys |
| Trichophyton | species | human and animal scalp, skin, nails | rarely recovered in air samples | IN | NO | NO | dermatophyte. Ringworm, infections of skin, scalp and nails | Microsporum, Epidermophyton |
| Ulocladium | species | soil, grass, wood, paper | in small numbers outside, moderate inside | BOTH | YES | NO | NONE | Aspergillus, Penicillium, Chaetomium, Acremonium, Stachybotrys |
| Uredinospores (Rusts) | | plant pathogen | variable in numbers produced | OUTSIDE | NO | NO | NO | seen at various times of the years outside with a combination of other outside spores |
| Ustilago | species | plant pathogen | | BOTH | NO | NO | NO | soil organisms |
| Verticillium | species | | | OUTSIDE | NO | NO | NO | |
| | | | | | | | | |

Air Allergen Mold Testing, Inc.
2041 Hessian Court
Stone Mountain, Ga. 30087

Page 6 of 6

AAMT
control # R101
Rev. 0
3/10/2010

Page 11 of 14

# GLOSSARY

| | |
|---|---|
| **Actinomycetes** | Class of filamentous bacteria associated with water damaged building materials. Strong earthy odor is present. Some genera are associated with skin and respiratory infections. |
| **Aspergillosis** | refers to any species of the genera *Aspergillus* and *Penicillium* that can infect the respiratory tract, sinuses, ear, eye, skin, mucous membranes and multiple systemic sites.  The most common cause of aspergillosis is *Aspergillus fumigatus* and *Aspergillus flavus* |
| **Ascomycetes (ascospores)** | a class of fungi characterized by the presence of asci and spores, and having two distinct reproductive phases, a perfect stage and an imperfect stage.  Outside, mainly found as plant pathogens. |
| **Basidiomycetes (basidiospores)** | the largest class of fungi the Basidiomycota has been divided into 2 classes, mushrooms, and the jelly, rust and smut fungi).  Major contributor to wood rot. |
| **Chromoblastomycosis** | granulomatos inflammation with supprative reaction, generally superficial and/or subcutaneous. |
| **Conidiophore** | also known as a "fruiting structure". Presence of a specialized hyphal structure that serves as a stalk on which the conidia are formed.  Indicative of current fungal growth. |

AAMT
Control # R102
Rev. 0
3/10/2010

| | |
|---|---|
| **Dermatophyte** | a fungus belonging to the genus, *Trichophyton, Epidermophyton* or *Microsporum*, with the ability to obtain nutrients from keratin and infect skin, hair, or nails of humans or animals. |
| **Deuteromycetes** | The **Fungi imperfecti** or **imperfect fungi**, also known as **Deuteromycota**, are fungi which do not fit into the commonly established taxonomic classifications of fungi that are based on biological species concepts or morphological characteristics of sexual structures because their sexual form of reproduction has never been observed; hence the name "imperfect fungi." |
| **ERMI Group 1** | set of fungal organisms that EPA proposes are found in homes that may have health risks due to high levels of "water loving" fungi |
| **Hyalohyphomycosis** | saprophytic fungi that produce colorless hyphae |
| **Hyphae** | string-like structures that support the spores of fungi.  Also called mycelia or mycelium |
| **Keratitis** | inflammation of the cornea of the eye |
| **Mycetoma** | a localized, chronic cutaneous or subcutaneous infection classically characterized by draining sinuses, granules and swelling. |
| **Mycosis** | disease caused by a fungus |

AAMT
Control # R102
Rev. 0
3/10/2010

| | |
|---|---|
| **Myxomycetes (slime mold)** | A class of peculiar organisms, the slime molds, formerly regarded as animals (Mycetozoa), but now generally thought to be plants and often separated as a distinct phylum (Myxophyta); essentially equivalent to the division Myxomycota. They are found on damp earth and decaying vegetable matter, and consist of naked masses of protoplasm, often of considerable size, which creep very slowly over the surface and ingest solid food. |
| **Onychomycosis** | a fungal infection that affects the fingernails or toenails |
| **Phaeohyphomycosis** | saprophytic fungi that produce dark brown to black hyphae and infect the skin and may also be subcutaneous. |
| **Sporotrichosis** | Subcutaneous infection that may produce ulcerations in the skin. |
| **Sterile Mycelium** | hyphae that have an absence of spores or conidia |
| **Subcutaneous** | situated or occurring directly under the skin |
| **Supprative** | producing puss |
| **Uredinospores (Rusts)** | are the thinner-walled spores of some fungi: (rusts and smuts), from which the basidium arises.  Plant pathogens. |
| **Xerophillic** | Prefers dry places, growing under dry conditions |
| **Zygomycosis** | infection caused by opportunistic fungi of the zygomycete group (*Rhizopus, Mucor, Rhizomucor, Absidia, Sycephalastrum, Cunninghamella*) |

AAMT
Control # R102
Rev. 0
3/10/2010

EXHIBIT A4

SWORN AFFIDAVIT OF KIMBERLY ARNOLD

I Kimberly Arnold, having personal knowledge of the matters stated therein,
declare under penalty of perjury that the following is true and correct:

1. I am over the age of 18.

2. I reside in Sandy Springs, GA.

3. I requested an accessible unit prior to move-in, and was told by management
that the unit was accessible.

4. I moved into Waters Edge Apartments on November 25, 2022, after
changing move in date twice per management's request to help with their
paperwork, and the unit was not accessible as requested.

5. I found water on floor due to an unmaintained, faulty hot water heater leak
on November 27, 2022 two days after moving in.

6. Upon further investigation of the hot water heater leak, I find mold in the
utility closet that was growing up the wall, in the connecting rooms to the
utility closet, mold was growing through the floor in the connecting
bathroom, mold had grown up the door panel leading into the master
bedroom and it's closet. The maintenance crew had attempted to paint over
the mold as they have done in numerous other areas of the unit.

7. I requested to move into another unit and was ignored by management.

8. After being ignored. I decided to stay in the unit and make the repairs myself
and was prevented by management citing corporate's approval.

9. My utility closet and it's connecting rooms did not get completed until
approximately January 11, 2023.

10. I found more mold in the 2nd bathroom under the sink on or about January
24, 2023, while I recorded the incident, management can be heard stating
that I was not supposed to see it, which clearly means that this was
intentional, malicious and a regular business practice.

11. On or about February 7, 2023, I smelled a foul odor of mildew in the
kitchen and the maintenance crew and found more mold under the kitchen
sink.

12. As of April 23, 2023, there still remains mold in the unit that management

and higher ups refuses to remove and repair.

13. I was told by Weller Management's attorney (Adam Joffe) that I was not authorized to make any repairs, modifications or adjustments to the unit even though the law gives me that right.

14. I have had headaches everyday due to the mold and me being prevented from making repairs. Adam Joffe stated that maintenance would make repairs, none have been made.

15. I have been harassed by Nancy Crolley ever since she became involved in this matter, and the attorney for Weller Management (Adam Joffe) has condoned and enabled her to do so. Nancy Crolley is recorded stating that she was gonna help and in the same recording stating that mold was not mold but that it was dirt. Nancy further begin to make statements as if I was able to leave my home when in fact I told her I couldn't leave my home due to the steps.